ATTORNEY FOR APPELLANT
Mark E. Shere
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
Bryan H. Babb
Daniel P. McInerny
Bose McKinney & Evans LLP
Indianapolis, Indiana

R. Davy Eaglesfield
Courtney B. Justice
Justice Law Offices
Logansport, Indiana



# In the
# Indiana Supreme Court

No. 40S01-1107-PL-436

HUGH DAVID REED,

*Appellant (Plaintiff below),*

v.

EDWARD REID; REID MACHINERY, INC.;
NORTH VERNON DROP FORGE, INC.;
JENNINGS MANUFACTURING CO., INC.;
REID METALS, INC.; GLEN WHITE; DOUGLAS
DIBBLE; MIDWEST ENVIRONMENTAL
SERVICES, INC.; AND ROGER CRANE,

*Appellees (Defendants below).*

Appeal from the Jennings Superior Court, No. 40D01-0711-PL-299
The Honorable Jonathan W. Webster, Special Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 40A01-1010-PL-521

**December 19, 2012**

**Rucker, Justice.**

After a steel fabrication company deposited solid waste on a landowner's property the landowner filed a complaint seeking damages against multiple parties and on multiple grounds, including a claim for an environmental legal action. Both sides moved for summary judgment. The trial court granted the motions with respect to some claims and denied the motions with respect to others. We affirm the trial court in part, reverse in part, and remand this cause for further proceedings.

**Facts and Procedural History**

In this summary judgment action the undisputed facts as shown by the materials presented to the trial court are as follows. Plaintiff Hugh David Reed ("David")[1] owns property in Scipio, Indiana, part of which he operates as an auction barn and part of which he leases as a nursing facility. In early 2004 David planned to build or expand a parking lot on his property and as part of that project posted a handwritten sign on the front of his property requesting "Clean Fill" and listing his telephone number. In response to this posting, a highway department contractor provided David multiple loads of fill from a highway construction project. Also, in June 2004 an employee of North Vernon Drop Forge, Inc.[2] allegedly called David offering him fill. See Appellant's App. at 996. David visited the Forge facility and arrangements were made for Forge to deliver fill to David's parking lot. On the date of delivery and while the dumping of the fill was in progress, David noticed unexpected materials in the fill and suspended the dumping of Forge fill on his property.

Sometime in February of 2005 the Indiana Department of Environmental Management ("IDEM") presented Forge with a Notice of Violation Letter. Appellant's App. at 776-77. This letter informed Forge that IDEM had conducted an investigation of Forge for possible violations of environmental laws, and that IDEM found violations at the Forge site. Id. In response Forge

---

[1] The plaintiff and one of the main defendants in this case have a surname that is spelled slightly differently but pronounced identically. For ease of reference we refer to the plaintiff by his middle name, since that is the way in which he is most often identified in the briefing before this Court; and we refer to one of the main defendants by his first name.

[2] The Forge was a steel fabrication company that manufactured parts for automobiles, trains, and agricultural equipment. The forging operations produced, among other things, mill scale, baghouse dust, and refractory brick and stone.

hired an environmental consulting company to test Forge waste located at both the Forge site and at David's auction barn site. See Appellant's App. at 684. Forge received the results of this testing in May of 2007. See id.

In August of 2007 Forge entered into an Agreed Order with IDEM acknowledging that it "caused and/or allowed the disposal of solid waste in a manner which created a threat to human health or the environment, when it disposed of excavated soil mixed with mill scale, baghouse dust, refractory brick, and other debris, at Reed's Auction House in Scipio, Indiana . . . ." Appellant's App. at 675. Forge further agreed to comply with environmental regulations in the future and agreed to waive its right to administrative and judicial review of IDEM's Order. See Appellant's App. at 675-76. The Order also provided that Forge was being assessed a penalty of "Zero Dollars," which IDEM confirmed "reflects a significant reduction based on the evidence submitted by [Forge] which adequately demonstrated an inability to pay." Appellant's App. at 676.

Then in late August or early September 2007 David also received a Notice of Violation letter from IDEM declaring, as a result of an investigation, IDEM had determined that "violations of environmental management laws and rules" exist at the auction barn site. Appellant's App. at 184. Specifically, IDEM's letter alleged that David had "allowed contaminants and waste into the environment," "deposited contaminants" upon his land creating a "pollution hazard" in a "method not acceptable to the solid waste management board," and that he had "caused and allowed . . . restricted waste" to be disposed of on his property "in a manner which creates a threat to human health or the environment." Appellant's App. at 186-87. IDEM included with the letter a proposed "Agreed Order" which required David to "clean up the Type III restricted waste at the Site by excavating all of it, as well as six inches beyond the waste," "dispose of the excavated soil and waste at a facility authorized to accept restricted waste," and "submit documentation to IDEM that the restricted waste . . . has been cleaned up and disposed of at a facility authorized to accept restricted waste." [3] The proposed order also assessed David a civil penalty of $6,250.00 for the violations. Appellant's App. at 190.

---

[3] "Restricted waste" is a classification of solid waste discussed in 329 Indiana Administrative Code sections 10-9-1 and 10-9-4. Restricted waste is classified by type, based on the concentration within the waste of certain constituent substances, including arsenic, chromium, lead, nickel, and selenium. Type I

3

David then went to Forge,[4] obtained the telephone number of Forge owner Edward Reid ("Edward"), and called Edward to tell him about the letter and "asked him what he was going to do about it." Edward told David he would "take care of it." Appellant's App. at 176-77 (Reed Dep. at 53-56). As a result of this conversation, David was eventually put in contact with the Forge's attorney, who requested David to fax him the IDEM documents, and later informed David that he couldn't help him and that David needed to hire his own environmental lawyer. Appellant's App. at 177 (Reed Dep. at 58-59). David obtained counsel to negotiate with IDEM regarding the Notice of Violation and proposed order.

In or around August 2008 David hired HydroTech, Inc., an environmental consulting company, to remediate his property according to IDEM's instructions. Appellant's App. at 182 (Reed Dep. at 78-79). Upon completion of the remediation, IDEM issued to David's attorney a "Resolution of Case" letter declaring that the agency had reviewed HydroTech's report documenting removal of the contaminated soil. Appellant's App. at 733. Ultimately David did not sign the Agreed Order. In any event IDEM waived David's civil penalties. See Tr. at 43.

In the meantime on May 2, 2008 David filed a fourteen count complaint against Forge, its employees: Roger Crane, Douglas Dibble, and Gen White, and Forge's environmental consultant – Midwest Environmental Services, Inc. Also named in the complaint is Edward Reid—owner of Forge—along with three other companies Edward owns: Jennings Manufacturing, Inc., Reid Machinery, Inc., and Reid Metals, Inc. (All of whom we refer to collectively as "the Defendants").[5]

restricted waste has the highest concentration of the constituents, Type IV the lowest concentration. A "restricted waste site" is a specially-licensed landfill; specifically, it is a "solid waste land disposal facility designed and operated to accommodate" restricted wastes as described in 329 I.A.C. section 10-9-4. 329 I.A.C. § 10-2.5-1(b)(57).

[4]The record is unclear as to why David immediately went to Forge at this point. However, the record reflects that Forge manager, Douglas Dibble, was present at David's auction barn parking lot taking photographs in June or July of 2005, and that David conversed with Dibble at that time. See Appellant's App. at 986 (Dibble Dep. at 23).

[5] On Nov. 17, 2008, David stipulated to a dismissal of his claims against Midwest Environmental Services, and Midwest was dismissed from the case on Feb. 24, 2009. See Appellant's App. at 7.

Seeking damages related to Forge waste David's complaint sets forth multiple theories of liability including statutory claims for environmental legal action, illegal dumping, and nuisance and common law claims of negligence, fraud, trespass, breach of contract, unjust enrichment, and reckless endangerment. David filed a motion for summary judgment on his environmental legal action claim and sought a summary determination that Edward individually as well as the corporations he controlled were liable through various corporate liability theories. The Defendants filed cross motions for summary judgment on David's environmental legal action claim and some of David's claims to impose corporate liability. The Defendants filed separate motions for summary judgment on all of David's other substantive claims except for his claim of negligence. And the Defendants moved for summary determination that particular items of damages were unavailable to David. The trial court denied David's motions and granted the Defendants' motions as to all claims, leaving for trial only David's negligence claim and the claims of potential liability against Edward individually and Reid Machinery, Inc. After a somewhat tortuous journey which resulted in the Court of Appeals dismissing David's appeal on procedural grounds, we granted transfer and now proceed to review the merits of the trial court's decision.[6] Additional facts are set forth below as necessary.

**Standard of Review**

When reviewing a grant or denial of a motion for summary judgment our standard of review is the same as it is for the trial court. Kroger Co. v. Plonski, 930 N.E.2d 1, 4 (Ind. 2010). The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." Gill v. Evansville Sheet Metal Works, Inc., 970 N.E.2d 633, 637 (Ind. 2012). Summary judgment is improper if the movant fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. Id. In determining whether summary judgment is proper, the reviewing court considers only the evidentiary matter the parties have specifically designated to the trial court. See Ind. Trial R. 56(C), (H). We construe all factual inferences in the non-moving party's favor and resolve all doubts as to the existence of a material issue against the moving party. Plonski, 930 N.E.2d at 5.

---

[6] The orders of summary judgment from which David appeals were entered by a former Special Judge appointed to this case.

The fact that the parties have filed cross-motions for summary judgment does not alter our standard for review, as we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. Hardy v. Hardy, 963 N.E.2d 470, 473 (Ind. 2012).

## Discussion

David contends the trial court erred in granting summary judgment to the Defendants on his numerous substantive claims and argues instead that he is entitled to summary judgment as a matter of law as to one of his statutory claims and that issues of material fact remain on the other claims, precluding summary judgment on those claims. David further argues the trial court erred by granting summary judgment in favor of Reid Metals, Jennings Manufacturing, and Edward on David's various theories of corporate liability, and that summary judgment in his favor was warranted on those issues. We address these contentions in turn.

### *Count I*

Count one of David's complaint asserts a claim under Indiana Code sections 13-30-9-1 through 13-30-9-8. Commonly referred to as an Environmental Legal Action (ELA), the statute provides:

> A person may, regardless of whether the person caused or contributed to the release of a hazardous substance[7] or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

---

[7] Indiana Code section 13-11-2-98 defines "hazardous substance" for purposes of I.C. §§ 13-19-5 (Environmental Remediation Revolving Loan), 13-25-4 and 13-25-5 (Voluntary Remediation) as having the meaning set forth in the Federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)). See 42 U.S.C. §§ 9601-9603; 40 CFR § 302.4 (table) (classifying, among others, arsenic, chromium, copper, lead, selenium, and zinc as hazardous substances). Although the Indiana Code does not define "hazardous substance" specifically for the purpose of section 13-30-9-2 the parties to this appeal have proceeded under the reasonable assumption that the CERCLA definition applies to an ELA claim as well.

I.C. 13-30-9-2.  This Court has previously declared:  "[I]t is clear from the plain language of Ind. Code ch. 13-30-9 that the legislature enacted the ELA statute to shift the financial burden of environmental remediation to the parties responsible for creating contaminations."  Cooper Indus., L.L.C. v. City of South Bend, 899 N.E.2d 1274, 1284 (Ind. 2009).

Defendants contend the trial court properly granted summary judgment with respect to David's ELA claim because they are not liable for the costs of removing the waste from David's parking lot.  Defendants advance three primary arguments in this regard: 1) any hazardous substances on David's property were not the result of Forge waste; 2) the presence of Forge waste on David's property did not pose a risk to human health and the environment; and 3) any costs David incurred in removing Forge waste are not recoverable because they are "unreasonable" as a matter of law.  Advancing a number of arguments, David counters that not only did the trial court err in granting summary judgment in favor of the Defendants on his ELA claim but the trial court also erred in denying his motion on this claim.

In support of their contention that any hazardous substances on David's property were not the result of Forge waste, Defendants argue that the contamination on David's property may have been the result of normal background levels of hazardous substances in the soil at the site, or that the hazardous substances may have originated from another source, such as the fill David received from the highway department.  According to Defendants "Reed has failed to eliminate background sources of naturally occurring metals detected on his property," and further, "if the levels of metals in the Forge waste material were the same or less than their indigenous levels at the Reed property, there was no release of a hazardous substance justifying a cost recover [sic] under the ELA."  Br. of Appellees at 13-14.

We make the following observations.  First, the plain language of the statute says nothing about the presence of background levels and their possible impact on recovery under the ELA. Rather, the issue is whether the release of a hazardous substance "poses a risk to human health and the environment."  I.C. § 13-30-9-2.  Background levels of hazardous substances at the auction barn site may or may not be relevant to this question.  But otherwise such levels have no bearing on whether a person may pursue an ELA claim in the first instance.  Second, as the moving party seeking summary judgment on David's ELA claim, Defendants have the burden of

7

demonstrating that as a matter of law the hazardous substances originated from a source other than the Forge waste. They submitted no Rule 56 materials in this regard. Instead Defendants seem to suggest that it is David's burden to demonstrate that the source of the hazardous substances in fact originated from Forge waste. This latter proposition is certainly true with respect to David's own motion for summary judgment, which we address below. But as to the Defendants motion for summary judgment, as the moving parties, they have the initial burden of proving the absence of a genuine issue of material fact as to an outcome-determinative issue. See Jarboe v. Landmark Cmty. Newspapers of Ind., 644 N.E.2d 118, 123 (Ind. 1994). Only then must the non-movant come forward with contrary evidence demonstrating the existence of genuine factual issues that should be resolved at trial. Id. Here, Defendants as the moving parties failed to carry their burden of demonstrating that the hazardous substances detected at the auction barn parking lot originated from a source other than Forge waste. Thus, on this point Defendants' argument fails.

In support of their contention that the presence of the Forge waste on David's property did not pose a risk to human health and the environment Defendants rely on federal authority standing for the proposition that under CERCLA certain minimum concentration levels of hazardous substances must be present before there can be any risk to human health and the environment. See, e.g., Johnson v. James Langley Operating Co., 226 F.3d 957, 960 (8th Cir. 2000 (quoting Johnson v. Langley Operating Co., Nos. 98-1007 & 98-1008, slip op. at 14 (W.D.Ark. Sept. 16, 1999)) ("[I]n order to hold the defendants liable under CERCLA, the plaintiffs in these cases must demonstrate that the levels of hazardous material found on the property pose a threat to the public health or environment. One way to do this would be to demonstrate that the hazardous materials are present at levels that violate applicable state or federal law.").

We first note the only Rule 56 materials Defendants designated that could possibly have a bearing on the question of whether the hazardous materials were present at levels that violate applicable state or federal law is a document from the federal office of land management titled "Trace Chemical Element Content of Natural Soils." Appellant's App. at 882-83 (identifying the "common" and "average" range of various metals including arsenic, chromium, copper, lead, nickel, selenium, and zinc, expressed in parts per million). Defendants point out that the

concentration levels of these elements on David's property are far below the range listed in the foregoing document. The problem, however, is that there is no indication in the record before us that the document has the force of law or for what purpose the document was created.

In any event although the ELA statute provides a cause of action closely resembling the cost recovery provisions in CERCLA Section 107, they are not the same. See, e.g., Cooper Indus., LLC, 899 N.E.2d at 1285 (recognizing that the ELA statute permits recovery for a landowner who had a hand in the contamination, whereas CERCLA does not); Commercial Logistics Corp. v. ACF Indus., Inc., No. 04-cv-00074-SEB-WGH, 2006 WL 3201916, at *4 (S.D. Ind. July 18, 2006) (concluding the CERCLA statute of limitations does not apply in ELA actions in part because "the ELA does not adopt or closely mimic CERCLA in any 'wholesale' fashion"). We are not prepared to say as a matter of law, that hazardous substances must meet any specific threshold levels in order to "pose [] a risk to human health and the environment" under the ELA. The statute itself includes no such requirement. And we decline to infer such a requirement. Defendants' argument on this point fails.

Finally, the Defendants argue David cannot recover any removal costs because the costs he incurred are not reasonable within the meaning of the ELA statute. See I.C. § 13-30-9-2 (permitting recovery for "reasonable costs of a removal or remedial action involving the hazardous substances"). And, the argument continues, if David's costs are not "reasonable," the issue of liability is immaterial. The Defendants assert, "If Reed had brought this action under CERCLA, he would not be able to recover his costs." Br. of Appellees at 18. They urge us to hold that to be considered "reasonable" under Indiana's ELA, removal or remediation costs must comply with CERCLA. As we have just discussed CERCLA and ELA are not the same.

To be recoverable under CERCLA, a plaintiff's costs must be "consistent with the national contingency plan."[8] 42 U.S.C. § 9607(a) (4) (B). Federal courts have used various

---

[8] As the EPA defines it: "The National Oil and Hazardous Substances Pollution Contingency Plan, more commonly called the National Contingency Plan or NCP, is the federal government's blueprint for responding to both oil spills and hazardous substance releases. The National Contingency Plan is the result of our country's efforts to develop a national response capability and promote overall coordination among the hierarchy of responders and contingency plans." EPA, National Oil and Hazardous Substances Pollution Contingency Plan Overview, http://www.epa.gov/oem/content/lawsregs/ncpover.htm (last visited Dec. 17, 2012).

9

methods to analyze whether costs are consistent with the National Contingency Plan ("NCP") but there is consensus among the courts that strict compliance with the NCP is not necessary. See, e.g., Carson Harbor Village, Ltd. v. Cnty. of Los Angeles, 433 F.3d 1260, 1268 (9th Cir. 2006) (recognizing that "substantial compliance" with the NCP is the appropriate standard); City of Gary v. Shafer, 683 F. Supp. 2d 836, 853 (N.D. Ind. 2010) (same); Sherwin-Williams Co. v. ARTRA Grp., Inc., 125 F. Supp. 2d 739, 751-753 (D. Md. 2001) (same). The Defendants correctly note that in various CERCLA cases, federal courts have considered a state agency's oversight of a remediation plan to satisfy certain NCP requirements, and they argue that an ELA plaintiff's remediation must be completed in compliance with Indiana's Voluntary Remediation Plan ("VRP") as a substitute for compliance with the NCP. See I.C. § 13-25-4-8.5(b). But Defendants overlook the fact that CERCLA includes a *statutory* requirement that costs be consistent with the National Contingency Plan. The ELA requires only that the costs sought be "reasonable." And remediation under the Voluntary Remediation Plan has a very specific purpose: to "facilitate the sale and reuse of industrial and commercial properties" by assuring the property owner (and future transferees) that no additional environmental actions will be instituted against them. IDEM, Risk-Integrated System of Closure (RISC) User's Guide at 1.3 (2010), available at http://www.in.gov/idem/files/riscuserguide.pdf. See also I.C. § 13-25-5-18.

Despite the Defendants' intricate argument that Indiana's environmental statutes can be read to require ELA removal costs be consistent with the NCP,[9] or that good public policy dictates that we require ELA removal costs to be consistent with Indiana's VRP, we decline to import such a requirement into the ELA statute and we leave those policy decisions to the Legislature. On this point the Defendants' argument also fails. In sum Defendants have failed to demonstrate they are entitled to judgment as a matter of law on David's ELA claim. The trial court thus erred in granting summary judgment in favor Defendants on this claim.

---

[9] The Defendants' argument proceeds something like this: Indiana defines "remedial action" and "removal" relative to its "Hazardous Substances Response Trust Fund" statute, Indiana Code section 13-25-4. That statute provides that a person who is liable for cleanup costs under CERCLA is also liable to IDEM for any costs IDEM incurred for cleanup of that person's waste, to the extent IDEM's costs incurred were consistent with the NCP. Therefore, a "removal or remedial action" under Indiana Code section 13-30-9-2 (the ELA) must be consistent with the NCP. See Br. of Appellees at 15-16.

10

With respect to David's motion for summary judgment, under the ELA statute liability arises only for one who "caused or contributed to the release of a hazardous substance." I.C. § 13-30-9-2. The phrase "caused or contributed" is not defined by statute. Therefore, the court is to give the words their plain and ordinary meaning. See 600 Land, Inc. v. Metro. Bd. of Zoning Appeals of Marion Cnty., 889 N.E.2d 305, 309 (Ind. 2008) (footnote omitted). And in order to determine the plain and ordinary meaning of words, we may consult English language dictionaries. Id. Each term of the phrase "caused or contributed" requires some involvement by the actor which produces a result.[10]

As indicated earlier in this opinion, Forge entered into an Agreed Order with IDEM acknowledging that it "caused and/or allowed the disposal of solid waste in a manner which created a threat to human health or the environment, when it disposed of excavated soil mixed with mill scale, baghouse dust, refractory brick, and other debris, at Reed's Auction House in Scipio, Indiana . . . ." Appellant's App. at 675. The record is clear that in response to the Agreed Order Forge hired an environmental expert, Midwest Environmental Services, Inc. ("Midwest"), to test the waste at Forge and the soil in David's parking lot at the auction barn site. Midwest's testing took place in May of 2007 and revealed the presence of arsenic and chromium in the refractory brick at Forge; chromium, lead, and selenium in the mill scale at Forge; and barium, lead, and selenium in the baghouse dust at Forge. Midwest's testing of the auction barn parking lot revealed the presence of chromium. Appellant's App. at 687. With Forge's acknowledgment, coupled with the consultant's test, David has carried his initial burden of demonstrating the Forge at least "share[d] responsibility for," see supra n.9, the release of the hazardous substance chromium on the auction barn parking lot.

In this appeal Defendants do not appear to contest Forge's acknowledgment or the consultant's testing with respect to the release of chromium. Instead Defendants make a different argument based on the following facts. In 2008 David hired his own expert—Hydrotech—to test the soil at the auction barn parking lot. Samples were also tested by a different expert hired by Defendants—Bureau Veritas. Both experts tested the samples using a

---

[10] "Cause" means "a person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state." Webster's Third New International Dictionary 356 (2002). Among other things, "contribute" means "to act as a determining factor; share responsibility for something." American Heritage Dictionary of the English Language 290 (1981).

different testing protocol than Midwest used in 2007. Both parties' testing revealed, among other things, the presence of arsenic, chromium, copper, lead, nickel, and zinc in the auction barn parking lot. See Appellant's App. at 1067-71. Each of the metals identified in the testing by all of the experts is classified as a "hazardous substance" for purposes of the ELA statute.

Defendants argue David failed to conduct any testing to establish if a release of a hazardous substance above background levels occurred from the Forge waste material. According to Defendants, "[w]ithout conducting background sampling, David Reed cannot prove that the arsenic and other metals detected in the Forge waste material were not due to naturally occurring background levels of such metals." Br. of Appellees at 12. In essence Defendants contend that the concentration levels of the hazardous substances identified by the 2008 testing indicate there was no "release" but rather the substances naturally occurred in the environment. This may be a credible claim with respect to the presence of arsenic, copper, lead, nickel, and zinc—the additional metals detected by the 2008 testing. However, this does not address the presence of chromium detected by the earlier testing; nor does it address Forge's acknowledgment that it "caused and/or allowed the disposal of solid waste in a manner which created a threat to human health or the environment, when it disposed of excavated soil mixed with mill scale, baghouse dust, refractory brick, and other debris, at Reed's Auction House in Scipio, Indiana . . . ." Appellant's App. at 675; see also Appellant's App. at 65 (Jennings Manufacturing's summary judgment motion describing as an "[u]ndisputed fact" that "in 2004 fill consisting of soil mixed with mill scale, refractory brick, and stone was dumped on David Reed's property"). On the narrow question of whether Forge "caused or contributed" to the release of chromium—a hazardous substance—there is no dispute of material fact. The Rule 56 materials make clear that Forge at least contributed to the release. This conclusion however does not end the analysis.

In order to prevail on his ELA claim, David must also demonstrate that the released substance "poses a risk to human health and the environment." I.C. 13-30-9-2. In support of this statutory requirement David relies exclusively on the Agreed Order Edward signed on behalf of Forge. However, the Order alone cannot bear the weight David attempts to put on its shoulders. More precisely the question here is whether the chromium that Forge contributed to releasing onto David's property or other hazardous substances Forge allegedly released, "pose[d] a risk to

12

human health and the environment." Id. The Order does say Forge's "solid waste" disposed of on David's property "created a threat to human health or the environment." And without parsing whether "create[s] a threat" is materially different from "poses a risk" suffice it to say the Order mentions nothing about hazardous substances. Indeed the Order refers to "soil mixed with mill scale, baghouse dust, refractory brick, and other debris . . . ." Appellant's App. at 675. Neither of which is classified as hazardous. It may very well be the case that the released substance or substances, at any levels of concentration, "poses a risk to human health and the environment." But David cannot sustain such a proposition based on an acknowledgement in an Agreed Order that addressed a much different issue. Failing to carry his burden on this critical point, David is not entitled to judgment as a matter of law on his ELA claim. The trial court properly denied David's motion for summary judgment.

In sum we affirm the trial court's denial of summary judgment in favor of David on his ELA claim and reverse the trial court's grant of summary judgment in favor of the Defendants on this same claim.

*Count II*

David's second count asserts a claim of illegal dumping. Indiana Code section 13-30-3-13(d) provides in relevant part:

> A landowner on whose land garbage or other solid waste has been illegally dumped without the landowner's consent may, in addition to any other legal or equitable remedy available to the landowner, recover from the person responsible for the illegal dumping:
>
> (1) reasonable expenses incurred by the landowner in disposing of the garbage or other solid waste; and
> (2) reasonable attorney's fees.

The trial court granted the Defendants' motion for summary judgment on this claim. Defendants do not contest that Forge dumped solid waste onto David's property. Rather, Defendants contend that David consented to the dumping. Because "consent" is not defined by statute we give the word its common and ordinary meaning. See 600 Land, Inc., 889 N.E.2d at 309. One such meaning, which we find most appropriate for this particular statute is

13

"[a]cceptance or approval of what is planned or done by another; acquiescence." The American Heritage Dictionary of the English Language 401 (1996).

In support of their contention Defendants point to selected portions of David's deposition in which David acknowledged that he was present when the Forge waste was delivered and, according to Defendants, David "then spread this material around his property." Br. of Appellees at 25. In Defendants' view "This evidence establishes that David Reed consented to the placement of the Forge material on his property in June 2004 that contained clearly visible waste fragments." Id. We first observe that it is not readily apparent that the conduct Defendants ascribe to David demonstrates his "acceptance or approval" or "acquiescence" of Forge dumping solid waste on his property. In any event David's deposition also reveals that he was seeking "clean fill," Appellant's App. at 171 (Reed Dep. at 32); that he went to the Forge site and was shown what appeared to be "blacktop," Appellant's App. at 172 (Reed Dep. at 37), was told "this is good stuff" and "there's no environmental problems with this." Id. But the material dumped on his property "had a lot of junk in it." David further testified "After I started spreading it and seeing what it was, I said, don't bring me any more of that stuff." Appellant's App. at 173 (Reed Dep. at 40-41).

The Rule 56 materials presented to the trial court demonstrate at the very least a disputed question of material fact on whether David consented to the dumping of solid waste on his property. Defendants are not entitled to summary judgment on this claim, and the trial court erred in granting their motion.

*Count III*

David's third count sounds in Fraud. David contends the Defendants committed fraud by representing the Forge waste as "clean fill" and describing it as "good topping for your parking lot" and having "no environmental problems." Appellant's App. at 172 (Reed Dep. at 37). David asserts he legitimately relied on these representations, resulting in damage to his property. The Defendants counter that the facts in this case do not suffice to satisfy the elements of fraud. The trial court granted the Defendants' motion for summary judgment on this issue.

To prove fraud, a plaintiff must show: "(i) material misrepresentation of past or existing facts by the party to be charged (ii) which was false (iii) which was made with knowledge or reckless ignorance of the falseness (iv) was relied upon by the complaining party and (v) proximately caused the complaining party injury." Rice v. Strunk, 670 N.E.2d 1280, 1289 (Ind. 1996).

In their motion for summary judgment on this issue Defendants contend David has not demonstrated the elements of fraud for several reasons. First, Defendants argue David cannot show that anyone from Forge called him offering "clean fill." Second, Defendants argue that Glen White's representation that the material he showed David "would be good topping for your parking lot" was an opinion not a fact. Third, Defendants characterize White's representation that there were "no environmental problems" as the erroneous legal opinion of a layman and therefore not actionable in fraud. Finally, the Defendants appear to argue that their actions could not have proximately caused David's damage because David himself spread the Forge waste on his property after Forge placed it there. See Br. of Appellees at 21-24.

The Defendants are correct that White's representation that the material "would be good topping for your parking lot" was an opinion and is therefore not a basis for fraud. But White's statement that there were "no environmental problems" with the material is not so easily disposed of. The Defendants cite American United Life Insurance Co. v. Douglas for the proposition that "a misstatement of law cannot form the basis of fraud because everyone is presumed to know the law and therefore, the allegedly defrauded party cannot justifiably have relied on the misstatements." 808 N.E.2d 690, 703 (Ind. Ct. App. 2004), trans. denied. The Defendants argue that White was offering a legal opinion as to the nature of the material and that David is presumed to have known the relevant environmental laws and therefore he could have ascertained for himself that the material was not free of "environmental problems." But the Defendant's reliance on Douglas is misplaced. In that case, an insurance company sold annuities to a business customer for the business's tax-qualified contributory retirement plan. The insurance company allegedly "misrepresented or omitted the objective and material fact that any investment in a qualified plan is tax deferred and the independent tax deferral property of the annuity was unnecessary." Id. The Court of Appeals observed that although also a fact, "the tax

15

deferral properties of the annuity are a matter of law." Id.[11] Unlike the situation in <u>Douglas</u>, the environmental properties of industrial waste are not matters of law. Rather, some such material may be free from environmental problems and other such material may not be. Whether the material Forge offered and delivered to David had "no environmental problems" was a material representation of existing fact sufficient to sustain an allegation of fraud.

The evidence conflicts as to whether a Forge employee contacted David by telephone offering "clean fill." Each deposed Forge employee denied making any such call. However, David stated that "a man" from the "Forge" called and asked him to come "look at" the material there. Appellant's App. at 171 (Reed Dep. at 32). And there is no dispute that the sign on David's property specifically requested "clean fill." David has put forth evidence establishing a question of material fact as to this element.

Finally, the question of whether any misrepresentation by Forge proximately caused damage to David is quintessentially one of fact. David's actions relative to the Forge waste on his parking lot are not dispositive of proximate causation. We reverse the trial court's grant of summary judgment in favor of the Defendants on the fraud count.

*Count IV*

Count four of David's complaint asserts a claim for private nuisance. David alleges that under Indiana Code section 32-30-6-6 the Defendants' deposit of Forge waste created a nuisance on the auction barn property. The trial court granted the Defendants' motion for summary judgment on this claim.

Indiana Code section 32-30-6-6 describes a nuisance as: "Whatever is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property." The Defendants contend summary judgment was proper on David's nuisance claim because, in their

---

[11] In <u>Douglas</u>, the Court of Appeals held despite being a misstatement of the law, the representation was still actionable in fraud under an exception because the representing parties "claimed an expertise in tax planning." Id. at 704.

reading of Indiana case law, a nuisance claim does not lie unless the nuisance stems from a defendant's use of his own adjacent land. The Defendants primarily rely on two unreported Southern District of Indiana cases which contain some dicta in this regard, but which addressed an entirely different question than the one presented here.[12] And our research has uncovered no Indiana state court authority recognizing any such rule.

In Gray v. Westinghouse Electric Corp., 624 N.E.2d 49 (Ind. Ct. App. 1993), trans. denied, the plaintiff property owners lived adjacent to a dump that was contaminated by toxic chemicals. Id. at 52. The defendant Westinghouse had allegedly caused the toxic chemicals to be placed in the dump, causing damage to plaintiffs' adjacent land. In holding that the plaintiffs could pursue a claim against Westinghouse for nuisance, the Court of Appeals noted, "[a]lthough most nuisance cases refer to the controversy as being between two landowners, it is because this is the norm, not because the law requires either party to be a landowner." Id. at 53 (footnotes omitted). This Court subsequently recognized the legitimacy of this reasoning, and quoted with approval the Court of Appeals' interpretation of the nuisance statute, observing that the statute:

> uses the broad term "whatever" to define the possible sources of a nuisance and it does not contain any reference to property ownership by the party creating the nuisance. This indicates the focus of the legislature was on protecting an individual's right to enjoy property from infringement by any source. We hold that the party which causes a nuisance can be held liable, regardless of whether the party owns or possesses the property on which the nuisance originates.

City of Gary v. Smith & Wesson Corp., 801 N.E.2d 1222, 1232 (Ind. 2003) (quoting Gray, 624 N.E.2d at 53) (internal citations omitted).

Here, the source of the alleged nuisance originated not on land adjoining David's property, but on David's property. It is of no consequence that Forge did not own David's property when it deposited the Forge waste there. Rather the questions are whether the Defendants' actions caused a condition on David's property which was: "(1) injurious to health;

---

[12] See Wickens v. Shell Oil Co., No. 05-CV-645-SEB-JPG, 2006 WL 3254544 (S.D. Ind. Nov. 9, 2006); Sanyo N. Am. Corp. v. Avco Corp., No. 06-CV-0405-LJM-WTL, 2008 WL 2691095 (S.D. Ind. July 3, 2008).

(2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property." I.C. § 32-30-6-6. These are questions for the jury. The trial court's grant of summary judgment on the nuisance count is reversed.

*Counts V and VI*

Counts five and six of David's complaint assert multiple claims of trespass. First, the complaint alleges the Defendants committed trespass by depositing Forge waste on his land. Second, the complaint alleges the Defendants, through Douglas Dibble, trespassed in the spring of 2007 by entering his property without permission. Third, the complaint alleges the Defendants (through Dibble) are responsible as the principal for the acts of environmental contractor Midwest Environmental Services, Inc. for its unauthorized entry with Dibble at that time. And fourth, the complaint alleges the Defendants (through Dibble) are responsible for Midwest's unauthorized entry on a separate occasion in 2007 to take samples for testing. The trial court granted summary judgment for the Defendants on the trespass claims.

In Indiana, "[e]very unauthorized entry on the land of another constitutes a trespass." Cullison v. Medley, 570 N.E.2d 27, 29 (Ind. 1991) (citing State ex rel. McPherson v. Beckner, 31 N.E. 950, 951-52 (Ind. 1892)). See also Calumet Nat'l Bank, Tr. v. Am. Tel. & Telegraph Co., 682 N.E.2d 785, 788 (Ind. 1997) (citing McPherson, 31 N.E. at 951) ("To make out a cause of action for trespass in this case, the [plaintiff] must prove that it owns the land in question and that the [defendants'] entry upon it was unauthorized."). The defendant in a trespass action need not have personally entered upon the plaintiff's land, but may trespass by causing a thing to enter the land. See Restatement (Second) of Torts § 158 cmt. i (1965) ("in the absence of the possessor's consent, . . . it is an actionable trespass to throw rubbish on another's land, even though he himself uses it as a dump heap").

A.    *The Forge waste*

In this case, there is no dispute that David owns the auction barn property. David contends that the intrusion of the Forge waste was unauthorized and was therefore a trespass.

18

The Defendants argue, in essence, that David consented to entry of the Forge waste. David counters that he consented to the delivery of clean fill, not to the deposit of hazardous substances on his property.

For the reasons we explained in more detail discussing the question of consent in the context of David's illegal dumping claim, Defendants are not entitled to summary judgment on David's trespass claim.

B.      *Dibble and the Spring of 2007*

In support of David's claim that Douglas Dibble trespassed on his property in the spring of 2007 David focuses on Dibble's entry (detailed in section C below) for the purpose of instructing Midwest to take soil samples. Again, the question is whether David consented to Dibble's presence. The evidence is conflicting. Dibble stated that although he spoke with David when he entered the property in 2005,[13] he did not speak with David when he entered in 2007, and Dibble concedes he did not personally obtain permission to enter the property. See Appellant's App. at 991-92 (Dibble Dep. at 35-36). If taken alone, Dibble's own statement demonstrates that he had no permission to enter David's property. Curiously, however, David's deposition testimony indicates that when Dibble was present on the property in early 2007, David did speak with Dibble and that David did not consider Dibble to be trespassing at that time. See Appellant's App. at 179 (Reed Dep. at 66). This evidence is sufficient to constitute a genuine issue of material fact as to whether David authorized and thus consented to Dibble's entry in spring 2007.

C.      *Midwest and the Spring of 2007*

This claim stems from Midwest's two entries onto David's property in the spring of 2007. On the first occasion, Midwest accompanied Dibble and Dibble gave Midwest specific instructions on the area of the parking lot from which to take a sample. See Appellant's App. at 987 (Dibble Dep. at 24). On the second occasion, Midwest returned to carry out the sampling as

---

[13] The 2005 entry is not contested on appeal.

Dibble had previously instructed. See Appellant's App. at 685 (Midwest's report to Doug Dibble and North Vernon Drop Forge detailing the collection of samples from the Auction Barn site). David asserts he gave no permission or authorization for Midwest to enter, nor did he have any knowledge of its entry. David contends Midwest was acting as Dibble's agent and therefore Dibble is liable for any trespass by Midwest.

Dibble counters that David's claims that Midwest trespassed are insufficient as a matter of law because David does not assert how any claimed trespasses caused him damage. Br. of Appellees at 32. But damages are not an element of trespass. "To make out a cause of action for trespass . . . the [plaintiff] must prove that it owns the land in question and that the [defendants'] entry upon it was unauthorized." Calumet Nat'l Bank, 682 N.E.2d at 788 (citing McPherson, 31 N.E. at 951); see also, e.g., Richardson v. Brewer, 81 Ind. 107, 109 (1881) ("If a trespass is committed, that is, if a right is invaded or interfered with, although without any actual damage resulting, the person to whom the right belongs may maintain an action and recover nominal damages." (internal quotation omitted)); Sigsbee v. Swathwood, 419 N.E.2d 789, 799 (Ind. Ct. App. 1981) ("In an action based upon the theory of trespass *quare clausum fregit*, the plaintiff needs to prove: 1) the plaintiff was in possession of the land; and 2) the defendant entered the land without right. If the plaintiff proves both elements he is entitled to nominal damages without proof of injury.").

We observe that generally, "a principal is not bound by the acts of his agent unless they are performed within the scope of the authority actually or ostensibly conferred upon him." Cincinnati, H. & I.R. Co. v. Carper, 13 N.E. 122, 124 (Ind. 1887). However, we have recognized that an independent contractor may create liability for his principal in certain circumstances. Shell Oil Co. v. Meyer, 705 N.E.2d 962, 978 (Ind. 1998). And "one who employs an independent contractor to perform work that is . . . likely to include trespass or nuisance is subject to liability to the same extent as the contractor for physical harm to others." Id. (citing Restatement (Second) of Torts § 427B (1965)). Defendants have not demonstrated that they are entitled to judgment as a matter of law with respect to this claim.

In sum, in response to the Defendants' motion for summary judgment on the trespass claims, David has come forward with sufficient evidence to establish genuine issues of material

20

fact as to each claim. We reverse the trial court's grant of summary judgment on the trespass claims.

*Count VII*

Count seven of David's complaint purports to assert a claim for unjust enrichment. The theory of the complaint appears to be as follows: by trespassing and depositing waste on David's property, the Defendants were spared certain civil penalties that would have been imposed on them by IDEM for waste that otherwise would have remained on Defendant's own property. The trial court granted summary judgment for the Defendants on this claim.

Also referred to as quantum meruit or quasi-contract, unjust enrichment requires a party who has been unjustly enriched at another's expense to make restitution to the aggrieved party. Bayh v. Sonnenburg, 573 N.E.2d 398, 408 (Ind. 1991) (citation omitted). To recover under an unjust enrichment claim, a plaintiff must generally show that he rendered a benefit to the defendant at the defendant's express or implied request, that the plaintiff expected payment from the defendant, and that allowing the defendant to retain the benefit without restitution would be unjust. Id.; see also Woodruff, Tr. v. Ind. Family & Soc. Serv. Admin., 964 N.E.2d 784, 791 (Ind. 2012) (quoting Sonnenburg, 573 N.E.2d at 408).

Here, David's claim fails as a matter of law. David does not contend that he in anyway rendered a benefit to the Defendants at the Defendants request; nor does David allege that for whatever reasons he expected to be paid by Defendants. We affirm the trial court's grant of summary judgment in favor of the Defendants on David's unjust enrichment claim.

*Count IX*[14]

Count nine of David's complaint states claims for breach of contract and breach of express warranty. According to the complaint David entered a contract with Forge for the delivery of clean fill, which he did not receive. The Defendants moved for summary judgment

---

[14] Count VIII of David's complaint sounds in negligence. Defendants did not seek summary judgment with respect to this count.

on this issue, alleging lack of consideration and seemingly arguing that the words they used to describe the fill did not constitute a warranty. The trial court granted the Defendants' motion.

Indiana Appellate Rule 46(A) (8) provides in part that the argument section of the appellant's brief must "contain the contentions of the appellant on the issues presented, supported by cogent reasoning," along with citations to the authorities, statutes, and parts of the record relied upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts under review. Moore v. Review Bd. of Ind. Dep't of Workforce Dev., 951 N.E.2d 301, 306 (Ind. Ct. App. 2011) (internal quotation marks omitted). Failure to comply with this rule results in waiver of the argument on appeal. See Infinity Prods., Inc. v. Quandt, 810 N.E.2d 1028, 1031 n.1 (Ind. 2004) (refusing to address arguments that do not conform to Indiana Appellate Rule 46(A) (8) (a)). Here, neither party has managed to develop an argument that merits our review. There is no reference in the briefing as to what, precisely, constituted the "contract" at issue – the parties merely banter about whether consideration was present. And although the parties make vague arguments about express warranty, there is not one reference or citation to the Uniform Commercial Code governing the sale of goods, or even one case (of any jurisdiction) discussing warranty. We will not review undeveloped arguments. This issue is waived for review.

*Count X*

Count ten of David's complaint purports to assert a claim for what is characterized as "intentional tort/reckless endangerment." Appellant's App. at 51. The trial court correctly granted the Defendants' motion for summary judgment on this claim.

David proceeds as if there is some claim available under Indiana law entitled "intentional tort." However, David discusses no elements of such a claim, and the sole case he cites in this regard involves a wrongful death claim arising out of the defendant's intentional criminal conduct. While battery, assault, and other causes of action are commonly recognized as being part of the general category "intentional torts," David asserts no such claim here. In apparent support of his "reckless endangerment" claim David cites a case holding that a products liability defendant could not deploy the "open and obvious danger" rule as an absolute defense to a claim

"alleging a culpability greater than ordinary negligence" such as "willful or wanton misconduct." Koske v. Townsend Eng'g Co., 551 N.E.2d 437, 443 (Ind. 1990). But as with his "intentional tort" claim, David fails to explain the elements of reckless endangerment or willful or wanton misconduct, or how the facts here even state such a claim. We would remind David's counsel to "avoid the 'kitchen-sink' method of appellate advocacy." Martin v. State, 760 N.E.2d 597, 601 n.3 (Ind. 2002). "Legal contentions, like . . . currency, depreciate through over-issue." Id. (quoting Justice Robert H. Jackson, Advocacy Before the United States Supreme Court, 25 Temple L.Q. 115, 119 (1951)).

## Count XII[15]

Count twelve of David's complaint seeks to impose individual liability on Edward Reid, Glen White, and Douglas Dibble under the theory of "Responsible Corporate Officers." And throughout his complaint, in addition to claims against Forge, David sought to impose liability on other corporate entities allegedly owned or controlled by Edward. This is presumably because IDEM's Agreed Order with Forge indicated Forge was insolvent. See Appellant's App. at 676. David advances several theories in support of his claims in this regard. These theories create no independent causes of action, but "merely furnish [] a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation." 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41.10 at 136 (perm. ed. rev. vol. 2006). Both David and the various Defendants moved for summary judgment on some of these issues. We address them under the general heading of "Corporate Liability Issues."

### A.     Liability as a responsible corporate officer

David moved for summary judgment against Edward on this issue, and the trial court denied the motion. Dibble and White moved for summary judgment against David on this issue, and the trial court granted their motion.

---

[15] Count eleven of Reed's complaint asserted a claim solely against Midwest Environmental Services, Inc. As noted earlier in this opinion David stipulated to the dismissal of this count. See supra n.5.

We have recognized that under certain circumstances, "an individual associated with a corporation may be personally liable under the responsible corporate officer doctrine for that corporation's violations of the Indiana Environmental Management Act, whether or not the traditional doctrine of piercing the corporate veil would produce personal liability." Comm'r, Ind. Dept. of Envtl. Mgmt. v. RLG, Inc., 755 N.E.2d 556, 558 (Ind. 2001).[16] As Justice Boehm wrote for a unanimous Court, an individual is liable under the responsible corporate officer doctrine under the following circumstances:

> (1) the individual must be in a position of responsibility which allows the person to influence corporate policies or activities; (2) there must be a nexus between the individual's position and the violation in question such that the individual could have influenced the corporate actions which constituted the violations; and (3) the individual's actions or inactions facilitated the violations.

RLG, Inc., 755 N.E.2d at 561 (quoting Matter of Dougherty, 482 N.W.2d 485, 490 (Minn. Ct. App. 1992)). The doctrine "applies to public welfare offenses that impose strict liability" by statute. Fletcher, supra §1135 at 235 (2011 rev.); RLG, Inc., 755 N.E.2d at 560.

The designated evidence reveals that Edward was either the sole or controlling shareholder of North Vernon Drop Forge, though he believed he was the sole shareholder. Appellant's App. at 662, 621-22, 880 (Dibble Dep. at 115, Reid Dep. at 93-94, Defs' Resp. to Pl's Mot. for Partial Summ. J. at 22). Although Edward testified that he was unsure whether he was President or Vice-President of Forge, Appellant's App. at 622 (Reid Dep. at 94) ("I don't know if I was president or not. I might have been vice-president, but I don't think I was president."), Edward signed IDEM's Agreed Order as Forge President. Appellant's App. at 632-33 (Reid Dep. at 107-08). Edward employed White to work for his company Reid Machinery, and sent White to work at Forge maintaining the machinery there. Appellant's App. at 604 (Reid Dep. at 64). For a period of time, Roger Crane acted as President of Forge. Appellant's App. at 235 (Crane Dep. at 7). And Robert Pettinger—Forge's accountant during that time period—testified that although Crane oversaw day-to-day Forge operations, Edward was an active participant in management of Forge and its employees. See Appellant's App. at 680-81 (Pettinger Aff. at 2-3) ("By 2003 or 2004, [Roger Crane's] authority was often titular rather than

---

[16] Reed makes a separate claim to pierce the corporate veil of Forge, which we address below.

24

real."). Crane and White kept Edward informed of how work was proceeding at Forge. White spoke with Edward directly at least once per week. Appellant's App. at 517-18 (White Dep. at 53-54). Edward's testimony establishes that he and Crane discussed finding "a place to get rid of" . . . "some excess dirt" from the Forge site, that he talked to Glen White about taking it to the auction barn, and that they "discussed that [David] Reed was interested in accepting the fill." Edward confirmed that he told Crane or White, "Find a place, get rid of it. . . .if [you] can find a place to dump it for fill, fine." Appellant's App. at 610-13 (Reid Dep. at 70-73).

Edward's position as sole or controlling shareholder of Forge is insufficient, standing alone, to establish individual liability under the responsible corporate officer doctrine. See RLG, Inc., 755 N.E.2d at 561. But the evidence here also demonstrates that Edward himself hired key Forge employees. Moreover, Edward was regularly apprised of Forge operations, he was involved in the decision to take the Forge waste to the auction barn, and he took responsibility with IDEM for Forge's environmental violations at the auction barn site. Thus, Edward "was directly involved in at least some corporate activities." Id. at 562. We found similar conduct sufficient in RLG to hold the company's sole shareholder personally liable for violations of Indiana environmental management laws. Edward has not come forward with any evidence to establish a genuine question of material fact as to his involvement in Forge's activities.[17] We therefore reverse the trial court's denial of David's motion for summary judgment as to the ELA action only, and find that Edward, as the responsible corporate officer of the Forge, is liable to the same extent as North Vernon Drop Forge on that claim.

As to the trial court's grant of Dibble's and White's motion for summary judgment on grounds they are not individually liable as responsible corporate officers of Forge, we agree. The evidence establishes that Edward sent White, who was on the payroll of another of Edward's companies, to Forge in order to perform maintenance on Forge machinery. White's discussion with David about taking the fill was insufficient to create a genuine issue of fact as to whether White was a responsible corporate officer. Dibble did not yet work for Forge at the time the

---

[17] The Defendants argued to the trial court that the responsible corporate officer doctrine is inapplicable in private actions such as this one. Appellant's App. at 155-56 (Defs' Br. in Support of Mot. for Partial Summ. J. at 32-33). However, the Defendants do not renew this argument on appeal and we consider it to have been abandoned. See City of Carmel v. Martin Marietta Materials, Inc., 883 N.E.2d 781, 789 (Ind. 2008).

25

auction barn received the Forge waste. Regardless of Dibble's subsequent role at Forge or at any other corporation controlled by Edward, he was not a responsible corporate officer of Forge for the purposes of David's claims. We thus affirm the trial court's grant of summary judgment in favor of Dibble and White on this claim.

B.      *Liability of Jennings Manufacturing as the successor to Forge*

David contends that Jennings Manufacturing Company, Inc.—another corporation solely owned by Edward—incurs Forge's liability as its successor under the doctrines of *de facto* merger and mere continuation. The trial court denied David's motion for summary judgment and granted Jennings Manufacturing's motion on this issue.

When a corporation purchases another corporation's assets, the buyer typically does not assume the seller's debts and liabilities. See Winkler v. V.G. Reed & Sons, Inc., 638 N.E.2d 1228, 1233 (Ind. 1994). The doctrines of *de facto* merger and mere continuation are among the generally recognized exceptions to this rule. Cooper Indus., LLC, 899 N.E.2d at 1288 (footnote omitted). A *de facto* merger occurs where a transaction is essentially a merger in all but name. Id. In determining whether a *de facto* merger has occurred, courts analyze issues such as the "continuity of the predecessor corporation's business enterprise as to management, location, and business lines; prompt liquidation of the seller corporation; and assumption of the debts of the seller necessary to the ongoing operation of the business." Id. (citations omitted). The mere continuation exception "asks whether the predecessor corporation should be deemed simply to have re-incarnated itself, largely aside of the business operations." Ziese & Sons Excavating, Inc. v. Boyer Const. Corp., 965 N.E.2d 713, 722-23 (Ind. Ct. App. 2012) (quoting Cooper Indus., 899 N.E.2d at 1290). Considerations in this inquiry include whether there is a continuation of shareholders, directors, and officers into the new corporate entity. Id.[18]

---

[18] In response to Reed's motion for summary judgment on this issue, Jennings Manufacturing argues it cannot be responsible for events that took place before it ever existed. See Br. of Appellees at 42. This argument misses the point of successor liability—which is to impose liability where it might not otherwise attach—for instance because the successor corporation was not in existence at the time of the underlying event. See Fletcher, supra §48 (2012 supp.).

26

In this case, the designated evidence reflects that Edward hired Douglas Dibble to replace Roger Crane at Forge in March of 2005. See Appellant's App. at 648, 658 (Dibble Dep. at 17; 111). Dibble continued as Forge's President until April 30, 2006, at which time Forge ceased operations. Appellant's App. at 648, 661 (Dibble Dep. at 17, 114). Jennings Manufacturing was incorporated in Indiana on October 18, 2006, Appellant's App. at 76, and operated a facility at 215 Industrial Drive, North Vernon, Indiana—the same location as Forge—after Forge ceased operating. Dibble oversaw operations at Jennings Manufacturing. Appellant's App. at 663 (Dibble Dep. at 130). There is substantial evidence that Edward maintained 100% ownership of Forge, Appellant's App. at 621, 662 (Reid Dep. at 93, Dibble Dep. at 115), and uncontradicted evidence that he was 100% owner of Jennings Manufacturing. Appellant's App. at 91 (minutes of Jennings Manufacturing's organizational meeting). There was confusion among both ownership and management as to who the officers of the corporations were. See Appellant's App. at 622, 625, 663-64 (Reid Dep. at 94, 97; Dibble Dep. at 130-31). Forge was officially dissolved on April 16, 2008. Appellant's App. at 833. Jennings Manufacturing continued to use the telephone and facsimile numbers listed for Forge. Appellant's App. at 668 (Dibble Dep. at 178). The record is conflicting as to who owns Forge real estate. Edward declared that he owns the property personally, or that possibly Reid Machinery owns the property. Appellant's App. at 589-90 (Reid Dep. at 26-27). Dibble claimed Jennings Manufacturing owns the property. Appellant's App. at 650 (Dibble Dep. at 19.) And Edward's accountant Marvin Henderson testified that title to Forge property remains vested in North Vernon Drop Forge, Inc., and the property has not been sold or leased to Jennings Manufacturing. Appellant's App. at 569 (Henderson Dep. at 124). The record reveals no written agreement between Forge and Jennings Manufacturing as to the purchase or use of Forge's assets.

The parties have designated evidence to create a genuine issue of material fact as to whether Jennings Manufacturing is a mere continuation of Forge or whether a sale (if there was one) of Forge assets to Jennings Manufacturing constituted a *de facto* merger of the companies. We affirm the trial court's denial of David's motion for summary judgment and reverse the trial court's grant of summary judgment in favor of Jennings Manufacturing.

27

*C.     Liability of Edward Reid and the other Reid entities by piercing the corporate veil*

In addition to Forge and Jennings Manufacturing, Edward owns two other sister corporations, Reid Machinery, Inc. and Reid Metals, Inc., Appellant's App. at 625, 630 (Reid Dep. at 97, 101), both of which are Michigan corporations. David moved for summary judgment arguing that Edward personally and all of his corporations are liable for potential damages in this action under the doctrine of "piercing the corporate veil." The trial court denied David's motion.[19]

As a general rule, shareholders are not personally liable for the acts of a corporation, Aronson v. Price, 644 N.E.2d 864, 867 (Ind. 1994) (citation omitted), and a corporation is not liable for the acts of related corporations. Greater Hammond Cmty. Servs., Inc. v. Mutka, 735 N.E.2d 780, 784 (Ind. 2000) (citing William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations §§ 41.10, 43, at 568, 711 (1999)). However, courts may invoke the equitable doctrine of piercing the corporate veil in order to "protect innocent third parties from fraud or injustice." Aronson, 644 N.E.2d at 867. When a corporation is functioning as an alter ego or a mere instrumentality of an individual or another corporation, it may be appropriate to disregard the corporate form and pierce the veil. See Mutka, 735 N.E.2d at 784; Fletcher, supra, § 41.10 at 124. "The propriety of piercing the corporate veil is highly dependent of the equities of the situation, and the inquiry tends to be highly fact-driven." Fletcher, supra, § 41.10 at 55 (2012 supp.) (footnote omitted). See also Cmty. Care Centers, Inc. v. Hamilton, 774 N.E.2d 559, 570 (Ind. Ct. App. 2002) (recognizing that "piercing the corporate veil should only be accomplished on summary judgment in extraordinary circumstances"), trans. denied. "[T]he burden is on the party seeking to pierce the corporate veil to prove that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice." Aronson, 644 N.E.2d at 867.

"While no one talismanic fact will justify with impunity piercing the corporate veil, a careful review of the entire relationship between various corporate entities, their directors and

---

[19] Reid Metals filed a cross motion for summary judgment arguing that the trial court lacked personal jurisdiction. We discuss Reid Metals' contention in section D below.

officers may reveal that such an equitable action is warranted." Stacey-Rand, Inc. v. J.J. Holman, Inc., 527 N.E.2d 726, 728 (Ind. Ct. App. 1988). When determining whether a shareholder is liable for corporate acts, our considerations may include: (1) undercapitalization of the corporation, (2) the absence of corporate records, (3) fraudulent representations by corporation shareholders or directors, (4) use of the corporation to promote fraud, injustice, or illegal activities, (5) payment by the corporation of individual obligations, (6) commingling of assets and affairs, (7) failure to observe required corporate formalities, and (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. Aronson, 644 N.E.2d at 867. In addition, when "a plaintiff seeks to pierce the corporate veil in order to hold one corporation liable for another closely related corporation's debt, the eight Aronson factors are not exclusive." Oliver v. Pinnacle Homes, Inc., 769 N.E.2d 1188, 1192 (Ind. Ct. App. 2002), trans. denied. Additional factors to be considered include whether: "(1) similar corporate names were used; (2) the corporations shared common principal corporate officers, directors, and employees; (3) the business purposes of the [organizations] were similar; and (4) the corporations were located in the same offices and used the same telephone numbers and business cards." Id. (footnote omitted). Further, a court may disregard the separateness of affiliated corporate entities when they are not operated separately, but rather are managed as "one enterprise through their interrelationship to cause illegality, fraud, or injustice or to permit one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." Id. These "single business enterprise" corporations may be identified by characteristics such as "the intermingling of business transactions, functions, property, employees, funds, records, and corporate names in dealing with the public." Id. See also Eden United, Inc. v. Short, 573 N.E.2d 920, 933 (Ind. Ct. App. 1991) (identifying additional indicia of "single business enterprise" corporations), trans. denied.

In support of his motion for summary judgment, David designated evidence with regard to several of the foregoing factors. For instance, David presented evidence that Forge was consistently undercapitalized, Appellant's App. at 680 (Pettinger Aff. at 2), and that certain corporate records for Forge were non-existent, Appellant's App. at 680-81 (Pettinger Aff. at 2-3) (company accountant was unaware of any stock certificates). There is evidence the Forge's assets were commingled with Edward's personal assets and/or assets of the sister corporations, Appellant's App. at 594 (Reid Dep. at 31) (Edward states the Forge property may be owned by

him personally or by Reid Machinery), and that Forge failed to observe corporate formalities, Appellant's App. at 616, 634-35 (Reid Dep. at 88, 140-41) (Edward is unsure who officers of the Forge are and declares there was no stock issued in Forge; Edward knows of no signed board meeting minutes).

Further, the record contains evidence that Edward personally made undocumented loans in excess of $1.4 million to Reid Machinery, Appellant's App. at 560-61 (Henderson Dep. at 86-87); Edward personally paid the operating costs of Jennings Manufacturing, Appellant's App. at 557-59 (Henderson Dep. at 40-42); and Edward's companies all shared Reid Machinery employees. Appellant's App. at 506-07 (White Dep. at 38-39) (Edward assigned Reid Machinery employee Glen White to the Forge); Appellant's App. at 652 (Dibble Dep. at 105) (Forge manager Doug Dibble's paychecks were drawn on Reid Machinery's account); Appellant's App. at 680 (Pettinger Aff. at 2) (Edward sent employees to Forge from the State of Michigan). The company accountant declared that on more than one occasion Edward advanced personal funds to Reid Machinery, and Reid Machinery wrote checks to pay obligations of Forge, Jennings Manufacturing, and Reid Metals. Appellant's App. at 582-83 (Henderson Dep. at 145-46) and that Edward made undocumented personal loans to all of his entities. Appellant's App. at 579-80 (Henderson Dep. at 142-43).

There is also evidence that the sister corporations shared a commonality of officers and directors, Appellant's App. at 558 (Henderson Dep. at 41) (company accountant believes Edward is president of Jennings Manufacturing); Appellant's App. at 616 (Reid Dep. at 88) (Edward believes he is president of Reid Machinery), and that they failed to observe corporate formalities. Appellant's App. at 616, 663-64 (Reid Dep. at 88, Dibble Dep. at 130-31) (Edward and management are uncertain who corporate officers of Reid Machinery and Jennings Manufacturing are; Appellant's App. at 616 (Reid Dep. at 88) (Edward states there is "zero" stock in Reid Machinery because "What the hell, I own the place. Why should I have stock?"). In sum, David designated substantial evidence that the sister corporations were mere instrumentalities or alter egos of Edward and each other.

Piercing the corporate veil involves a highly fact-sensitive inquiry that is not typically appropriate for summary disposition. We will affirm the trial court's decision only if no genuine

30

issues of material facts exist and the movant is entitled to judgment as a matter of law.  See Ind. Trial Rule 56(C).  If we have any doubts concerning the existence of a genuine issue of material fact, we must resolve those doubts in favor of the nonmoving party and reverse the entry of summary judgment.  Gaboury v. Ireland Rd. Grace Brethren, Inc., 446 N.E.2d 1310, 1313 (Ind. 1983).  A fact is material for summary judgment purposes if its resolution is decisive of either the action or a relevant secondary issue.  Id.  A factual issue is genuine if those matters properly considered under Indiana Trial Rule 56 evidence a factual dispute requiring the trier of fact to resolve the opposing parties' different versions.  Id.  Finally, we note that "[s]ummary judgment should not be granted when it is necessary to weigh the evidence."  Bochnowski v. Peoples Fed. Sav. & Loan Ass'n, 571 N.E.2d 282, 285 (Ind. 1991).

Here Edward's Rule 56 materials in opposition to David's motion for summary judgment were scant, basically contesting the point that Forge was undercapitalized, see Appellant's App. at 880 (Defs. Resp. to Pl's Mot. for Partial Summ. J. at 22) ("[T]he Forge operated from 1992 to 2004, which is fairly long for an undercapitalized business to operate."), and that Edward was Forge's sole shareholder.  See Appellant's App. at 680 (Pettinger Aff. at 2) (accountant's testimony that Roger Crane may have owned a percentage of Forge stock).  Nonetheless "[t]he propriety of piercing the corporate veil is highly dependent of the equities of the situation, and the inquiry tends to be highly fact-driven."  Fletcher, supra, § 41.10 at 55 (2012).  And whether equity demands that the corporate veil should be pierced in this case to prevent fraud or injustice requires weighing the evidence.  It is for the fact finder to determine whether the separate corporate identities of Edward's companies may be disregarded so that liability may be imposed on Edward personally, Jennings Manufacturing, and/or Reid Machinery.  We thus affirm the trial court's denial of David's motion for summary judgment seeking to impose liability on Edward and his entities by piercing the corporate veil.

*D.      Personal jurisdiction over Reid Metals, Inc.*

Reid Metals, Inc. moved for summary judgment, arguing it cannot be held liable because the trial court lacks personal jurisdiction over a Michigan corporation doing no business in Indiana.[20]

"Because Indiana state trial courts are courts of general jurisdiction, jurisdiction is presumed." Anthem Ins. Cos. v. Tenet Healthcare Corp., 730 N.E.2d 1227, 1231 (Ind. 2000) (footnote omitted), superseded by statute on other grounds. Once a party (usually the defendant) challenges the existence of personal jurisdiction, the plaintiff then must present evidence to show the court's jurisdiction over the defendant. Id. The defendant, however, "bears the burden of proving the lack of personal jurisdiction by a preponderance of the evidence, unless the lack of jurisdiction is apparent on the face of the complaint." Id. Because personal jurisdiction is a question of law, we review it de novo and do not defer to the trial court's legal conclusion on this question. LinkAmerica Corp. v. Cox, 857 N.E.2d 961, 965 (Ind. 2006).

In Indiana, Trial Rule 4.4(A) permits the exercise of personal jurisdiction "on any basis not inconsistent with the Constitution of this state or the United States." As LinkAmerica makes clear, the ultimate inquiry is "whether the exercise of personal jurisdiction is consistent with the Federal Due Process Clause." 857 N.E.2d at 967. The Due Process Clause of the Fourteenth Amendment requires that a defendant have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" LinkAmerica, 857 N.E.2d at 967 (alteration in original) (quoting Int'l Shoe Co. v. Wash., 326 U.S. 310, 316 (1945)).

In support of its motion for summary judgment Reid Metals tendered to the trial court Edward's affidavit which declared, among other things, that Reid Metals "has never done business in Indiana, nor has it ever solicited business in Indiana. . . . Reid Metals has never contracted to provide services, goods, or materials in Indiana, and it has never derived revenues or benefits from Indiana. . . . Neither has Reid Metals, Inc. nor any of its employees, ever been

---

[20] Defendants do not contest the existence of personal jurisdiction over Reid Machinery, Inc., also a Michigan corporation. See Br. of Appellees at 41.

associated with, or been involved in any transactions involving the Defendant North Vernon Drop Forge, Inc. or David Reed. . . . Reid Metals, Inc., has never had any contact with David Reed." Appellant's App. at 73. In essence, Reid Metals argued not only did it have no minimal contacts with Indiana, it had no contacts at all. The trial court apparently granted summary judgment to Reid Metals on this ground.

It may very well be true that as a separate corporate entity Reid Metals had no minimal contacts with Indiana. But the question here is whether the interrelationship between Reid Metals and the other corporate entities—Forge, Reid Machinery, and Jennings Manufacturing—was such that jurisdiction over either of them may be attributed to Reid Metals.

It is certainly the case that related corporations are presumed to be independent entities. See LinkAmerica, 857 N.E.2d at 968 (citing Wesleyan Pension Fund, Inc. v. First Albany Corp., 964 F. Supp. 1255, 1261 (S.D. Ind. 1997). Therefore, one corporation's "contacts with a forum are not attributed to" a sister corporation for jurisdictional purposes. Id. In other words, "*when corporate formalities are observed*, permitting the activities of the subsidiary to be the basis for exercising jurisdiction over the parent violates due process." Id. (emphasis added) (citing Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 944 (7th Cir. 2000) (discussing sister corporations)). Where corporate formalities are not observed, however, the presumption that related corporations are independent may be overcome. This requires evidence of one of the following: (1) one corporation uses a related corporation in such a manner that an agency relationship can be perceived; (2) one corporation has greater control over a related corporation than is normally associated with common ownership and directorship; or (3) the related corporation is merely an empty shell. See id. (citing Wesleyan, 964 F. Supp. at 1261-62). As we observed in LinkAmerica:

> Piercing the veil is a doctrine of liability, and "minimum contacts" is a jurisdictional concept. Piercing may, in some instances, be based on facts that also support the assertion of jurisdiction over the parent of a subsidiary. Otherwise stated, the same conduct of a foreign corporate defendant may in some cases expose it to both personal jurisdiction and liability under the laws of a particular forum.

857 N.E.2d at 970 (citing Cent. States, 230 F.3d at 944).

33

David alleges that Reid Metals is part of a "corporate web that is under [Edward's] complete control." Br. of Appellant at 42. Edward concedes he is "the sole shareholder and President of Reid Metals, Inc.," see Appellant's App. at 72 (Reid Aff. at 1), and characterizes Reid Metals as "a place where I store some of my equipment, and I had that 25 years ago, maybe 30. I had it as like a scrap yard." Now it is "[u]sed for storage and some recycling of some metals." Appellant's App. at 629-30 (Reid Dep. at 101-02). It appears that Reid Metals has no employees of its own but that "[t]he people that's working there is working for Reid Machinery." Appellant's App. at 631 (Reid Dep. at 103).

As explored in more detail in section C supra there are unresolved disputed questions of fact as to whether Edward's affiliated corporate entities were operating separately or whether they were managed as "one enterprise through their interrelationship to cause illegality, fraud, or injustice or to permit one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." Oliver, 769 N.E.2d at 1192. The trial court thus erred in granting summary judgment in favor of Reid Metals on grounds that as a separate corporate entity it had no minimal contacts with Indiana.[21] We therefore reverse the trial court's grant of summary judgment on this claim.

## Conclusion[22]

We affirm the trial court as follows: denial of summary judgment for David on his ELA claim; denial of summary judgment for David on his claims that Edward and his corporations are liable under the corporate law doctrine of piercing the corporate veil; denial of summary judgment for David on his claim against Jennings Manufacturing as successor to Forge; grant of summary judgment for Defendants on David's unjust enrichment claim; grant of summary

---

[21] It is true that we may affirm the grant of summary judgment any grounds the Rule 56 materials support. Woodruff, 964 N.E.2d at 790. Here however the materials provide no alternative grounds to support the trial court's judgment.

[22] Labeled "Declaratory judgment" count thirteen purports to seek declaratory relief concerning elements of David's alleged entitlement to damages. Whether and to what extent David is entitled to damages is subsumed into and dependent upon whether he is successful on remand with any of his various claims. Count fourteen of David's complaint asserts a separate claim of liability against "Roger Crane." In this appeal David advances no argument in support of this claim. It is therefore waived.

judgment for Defendants on David's intentional torts claim; and grant of summary judgment for Dibble and White on David's responsible corporate officer claim.

We reverse the trial court as follows: denial of summary judgment for David on David's claim against Edward as responsible corporate officer of Forge; grant of summary judgment for Defendants on David's ELA claim; grant of summary judgment for Defendants on David's illegal dumping claim; grant of summary judgment for Defendants on David's claim of fraud; grant of summary judgment for Defendants on David's nuisance claim; grant of summary judgment for Defendants on David's trespass claims; grant of summary judgment for Defendants as responsible corporate officers of Forge; grant of summary judgment for Jennings Manufacturing on David's successor liability claim; and grant of summary judgment for Reid Metals on its personal jurisdiction claim.

This cause is remanded for further proceedings.

Dickson, C.J., and David, Massa and Rush, JJ., concur.