ATTORNEYS FOR APPELLANT

Donn H. Wray
Glenn D. Bowman
Marc A. Menkveld
Stoll Keenon Ogden PLLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
BORGWARNER MORSE TEC INC.

Richard S. VanRheenen
Tabitha L. Balzer
Lewis Kappes, P.C.
Indianapolis, Indiana



FILED
Aug 28 2018, 8:47 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# COURT OF APPEALS OF INDIANA

Estate of Walter E. Williams,

*Appellant (Third-Party Plaintiff),*

v.

BorgWarner Morse TEC Inc., et al.,

*Appellees (Third-Party Defendants).*

Chuck Markey, Markey's Audio Visual, Inc., and D&E Enterprises,

*Plaintiffs,*

v.

George F. Kopetsky, Patricia A. Kopetsky, George F. Kopetsky Realty Corp., Walter E. Williams, Edward F. Frazier, John Bartkiewicz, Richard Clapper, and Ted Pollard,

*Defendants.*

August 28, 2018

Court of Appeals Case No.
49A02-1710-PL-2224

Appeal from the Marion Superior Court

The Honorable Timothy W. Oakes, Judge

Trial Court Cause No.
49D02-0607-PL-28561

**Brown, Judge.**

[1] The Estate of Walter E. Williams (the "Estate") appeals the trial court's entry of summary judgment in favor of BorgWarner Morse TEC, Inc. ("Morse TEC").[1] The Estate raises one issue which we revise and restate as whether the court erred in entering summary judgment in favor of Morse TEC. We affirm.

*Facts and Procedural History*

[2] This case involves an Environmental Legal Action ("ELA") under Ind. Code §§ 13-30-9. In the 1960s, George Kopetsky constructed a building to house a laundromat and dry cleaning operation on property he owned at 2915 South Meridian Street, Indianapolis, Indiana (the "Site"). Kopetsky purchased coin-operated washing and dry cleaning machines and named the location Norge Laundry & Dry Cleaning Village ("Norge Village"). Kopetsky operated Norge Village until 1967 when he leased it to Edward Frazier, who operated it until September 29, 1969, when Williams purchased the Site and assumed Kopetsky's mortgage.

[3] Williams operated Norge Village until May 1, 1974. He leased the Site to others, including John Bartkiewicz and Richard Clapper, who continued to operate Norge Village pursuant to a lease agreement. At some point, Clapper withdrew from the lease arrangement. In 1981, Norge Village ceased operation

---

[1] The chronological case summary ("CCS") contains an entry, dated April 27, 2017, which states that the "Estate of Walter E. Williams shall be substituted for Defendant Walter E. Williams." Appellant's Appendix Volume 2 at 59.

at the Site and the machines were removed. On August 25, 1995, Williams sold the Site to D&E Enterprises.

[4] On July 12, 2006, Chuck Markey, Markey's Audio Visual, Inc., and D&E Enterprises, Inc., filed a complaint against Williams and others for environmental response costs, attorney fees, and damages under Ind. Code §§ 13-30-9 to recover the costs of remedial action involving hazardous substances released into the soil and groundwater. The complaint alleged that Markey was the owner of Markey's Audio Visual, Inc., and D&E Enterprises, Inc., and that D&E Enterprises, Inc., was the current owner of the Site.

[5] On April 30, 2008, Williams filed a third-party complaint against "Borg-Warner Morse TEC Corporation." Appellee's Appendix Volume 2 at 37. On March 25, 2010, Williams amended its complaint, naming the defendants as "Borg-Warner Corporation," "Borg-Warner Corporation, as successor in interest to Norge Corporation," Morse TEC, and Burns International Services Company, LLC, ("Burns"). *Id.* at 44. The amended complaint stated in part:

> 3. . . . Norge Corporation is a corporation that does or has existed, and conducted business in Indiana relating to its sale and installation of dry cleaning equipment.
>
> 4. . . . Borg-Warner is a Delaware corporation that conducted business in Indiana at all times relevant to this Complaint through the sale of Norge brand dry cleaning equipment by its Norge Division.
>
> 5. . . . Borg-Warner is a successor in interest to the Norge entity that conducted business in Indiana relating to the sale and installation of Norge brand dry cleaning equipment.

6. . . . Morse TEC[] . . . conducted business at all times relevant to this Third-Party Complaint through the sale of Norge brand dry cleaning equipment by its Norge Division.

* * * * *

10. . . . [George and Patricia Kopetsky] purchased Norge dry cleaning equipment and other cleaning equipment ("Equipment") in the mid- to late- 1960s.

11. . . . [R]epresentatives of Norge installed some or all of the equipment.

12. . . . Borg-Warner owned and operated the Norge division from approximately 1929 until selling the Norge division . . . on July 1, 1968.

13. . . . Morse TEC is the corporate successor in interest to Borg-Warner that formerly owned and operated the Norge division, including but not limited to the manufacture and installation of [the Norge dry cleaning equipment and other equipment].

* * * * *

22. It is also believed that release of chlorinated solvents occurred when used or spent chlorinated solvents were discharged to the public sewers as arranged and directed by Borg-Warner and Morse TEC.

* * * * *

32. To the extent this Court, pursuant to I.C. 13-30-9-3, in resolving this environmental legal action, allocates the cost of removal or remedial action in proportion to the acts or omissions of each party, Williams alleges that Morse TEC is wholly liable for the release of chlorinated solvents at the Site.

*Id.* at 45-46, 48-49.

[6] Morse TEC and Burns filed separate motions for summary judgment on Williams's amended third-party complaint.[2] On August 28, 2013, the court granted Burns's motion, denied Morse TEC's motion, and found, with respect to Burns, that Williams lacked standing to assert a contract claim against Burns, that no corporate successor liability had been created "by the ELA that would transfer financial responsibilities from the Norge Division to Burns," and that there was no other basis for imposing successor liability on Burns. Appellant's Appendix Volume 2 at 71.

[7] With respect to Williams, the court found the costs incurred to date by him were "costs of removal and remedial action," he is a real party in interest to pursue his third-party ELA claim against Morse TEC, and that the fact that Williams's insurer, rather than Williams himself, paid the remedial and removal costs incurred to date does not diminish or destroy his standing to bring an ELA claim against Morse TEC. *Id.* at 72. In also concluding that an ELA defendant may bring a third-party ELA claim against other potentially responsible parties, the court stated:

> Williams can maintain an ELA claim against Morse TEC, but there is still a genuine issue of material fact as to whether Morse TEC is liable. This Court concludes that Williams has properly

---

[2] The record includes copies of Morse TEC's October 13, 2011 motion for leave to file a summary judgment motion on Williams's amended third-party complaint, the accompanying motion for summary judgment, and the court's December 1, 2011 order granting Morse TEC's motion for leave to file its summary judgment motion. While the record does not appear to include a copy of Burns's motion for summary judgment, the CCS contains an entry, dated September 29, 2011, which is titled "Motion for summary judgment against [Williams's] third party claims, filed by [Burns]." Appellant's Appendix Volume 2 at 22-23.

asserted a third-party claim against Morse TEC, and Morse TEC potentially may be allocated its share of responsibility according to the purpose and plain language of the ELA.

*Id.* at 74.

[8] On January 9, 2017, Morse TEC filed a second motion for summary judgment.[3] Its accompanying memorandum in support of the motion stated in relevant part:

> Cases interpreting the ELA have construed the "caused or contributed to the release" element of the statute to require a defendant's active involvement in releasing or spreading hazardous substances at a site or, in the limited case of a landlord with actual knowledge of a release of hazardous substances, having sufficient control over the site to halt or remediate the release, yet failing to act. It is undisputed that Norge never released or spread PCE at the [S]ite. [Norge] never handled PCE at the Site or operated the dry cleaning machines at the Site. It was Williams (and others) who handled PCE at the Site and operated the dry cleaning machines. Furthermore, Norge never owned the Site, and therefore was never a landlord with knowledge of a release at the Site and control over the Site. Thus, Williams' allegations that Norge manufactured and installed dry cleaning machines at the Site are insufficient as a matter of law to support ELA liability. Additionally, even if installation of the dry cleaning machines could support ELA liability (and it cannot), there is no evidence that Norge installed the dry cleaning machines. . . .

---

[3] The record does not contain a copy of Morse TEC's motion, but does contain copies of both the accompanying memorandum in support of the motion and the designation of evidence that were filed on the same day as the motion.

> Finally, Williams' ELA claim, brought against a manufacturer for property damage, is a products liability claim in disguise, and is barred by the applicable Indiana Products Liability Act statute of limitations.

*Id.* at 149-150.

[9] On April 3, 2017, Williams filed a memorandum in opposition to the second motion for summary judgment, which argued in relevant part that discovery to date showed that Morse TEC was liable "because the Norge dry cleaning system, as designed and described in Norge Operating Manuals, provided for the dry cleaning machine's water/PCE separator to be plumbed directly to drains." *Id.* at 180.

[10] On April 17, 2017, Morse TEC filed its reply and, on May 1, 2017, the court held a hearing. On August 23, 2017, the court granted Morse TEC's motion for summary judgment in an order which stated in relevant part:

### Facts

\* \* \* \* \*

> The machines sat along the north and east wall of the building on a floor that was recessed between 4.5 and 5 inches. The Norge service instructions recommended all the dry cleaners be set upon a 4" high concrete "dike" to entrap solvent that might escape from the system.
>
>> The 'diked' area should be connected to a floor drain in which the cleaning solvent can flow to an underground storage tank. In cases where a major solvent leak may occur, the solvent may be pumped from the underground storage tank back

into the Dry Cleaning System after the leak has
been corrected.

The manual also provided, "The successful operation of the Norge Automatic Dry Cleaning Equipment is directly influenced by the type of installation."

The dry cleaning equipment always used PCE as a solvent to clean the clothing, "NorgClor, which was a PCE-based solvent made to Norge's specifications by the Dow Chemical Company and distributed by Norge's exclusive distributors." The *Norg-Clor* PCE solvent was reclaimed from each dry cleaning load's cycle. "Part of the solvent reclamation process involved an oil-water separator in which the solvent was separated from water. The water was discharged to a sanitary sewer and the reclaimed solvent was diverted back into the solvent tank. The water discharge contained '10 or 20 drops' of solvent per load." The Norge coin operated dry cleaning machine manual recommended that wastewater from operation of the equipment go into a sewer line. Along with the 10-20 drops of PCE per dry cleaning load, some amount of dissolved PCE was present in the machine wastewater and went into the sewer. This wastewater caused sewer trench contamination on the Property. Feenstra, who also prepared a designated expert report, opined the PCE released to the sewer was insufficient to explain the PCE found in the soil outside of the sewer area.

There were also releases in the area under the machines, as evidenced by high PCE concentrations in the soil under the concrete. Other possible releases of PCE could be, "spills or leaks to the ground during delivery; leakage through the concrete floor of the recessed area around the dry cleaning machines; leakage from waste materials disposed to the dumpster; or leakage from the possible underground concrete tank reported to have been located along the north side of the building."

* * * * *

## DISCUSSION

* * * * *

The Court FINDS Morse TEC'S involvement with the Property does not meet the criteria of active engagement contemplated by the ELA statute for "caused or contributed." Williams alleges that Kopetsky purchased dry cleaning equipment designed and manufactured by Norge. Williams also alleges that Norge assisted in the installation of the equipment. As the non-moving party, the Court construes all inferences in Williams's favor. These allegations of design, product manufacture and product installation, even if true, would not be sufficient to impose liability under the ELA against Morse TEC.

* * * * *

The parties have not cited to the Court any ELA case where an off-site manufacturer is alleged to be liable under the ELA. Liability in all ELA cases cited by the parties, was based on facts that included alleged site-specific acts of spilling, dumping, disposing or otherwise releasing hazardous substances either at the site in question or at an adjacent site from whence they migrated to the site in question.

The Court notes the installation manual itself shows that site-specific decisions relating to installation of the machines, including wastewater connections, were in the hands of others. The installation manual recommends connecting the wastewater discharge to a drain but also includes the phrase "per local building code." Thus, according to the designated documents[,] others, not Norge, were responsible for waste disposal. In sum, the lack of any site[-]specific acts by Norge which "caused or contributed to the release of a hazardous substance" excludes Norge from liability under the ELA. This is especially true given that any acts resulting in the dry cleaning machines being connected to the sanitary sewer at the Property were in the hands of others. As stated by the Norge manual, "[t]he successful

> operation of the Norge Automatic Dry Cleaning Equipment is
> directly influenced by the type of installation."

*Id.* at 81-86 (some internal citations omitted).

### *Discussion*

The issue is whether the trial court erred in entering summary judgment in favor of Morse TEC. We review an order for summary judgment *de novo*, applying the same standard as the trial court. *AM Gen. LLC v. Armour*, 46 N.E.3d 436, 439 (Ind. 2015). The moving party bears the initial burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013).

"A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth . . . or if the undisputed material facts support conflicting reasonable inferences." *Celebration Worship Ctr., Inc. v. Tucker*, 35 N.E.3d 251, 253 (Ind. 2015) (quoting *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (internal citations omitted)). If the moving party affirmatively shows that there are no genuine issues of material fact with regard to a particular issue or claim, the non-moving party then bears the burden of coming forward with designated evidence showing the existence of a genuine issue of material fact. *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 577 (Ind. 2013) (citing Ind. Trial Rule 56(C); *Town of Avon v. W. Cent. Conservancy Dist.,* 957 N.E.2d 598, 602 (Ind. 2011)). The reviewing court construes all factual inferences in

the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1270 (Ind. 2009) (citing *N. Ind. Pub. Serv. Co. v. Bloom*, 847 N.E.2d 175, 180 (Ind. 2006)). Where the relevant facts are not in dispute and the interpretation of a statute is at issue, such statutory interpretation presents a pure question of law for which summary judgment disposition is appropriate. *Boots v. D. Young Chevrolet, LLC*, 93 N.E.3d 793, 797 (Ind. Ct. App. 2018) (citing *Clem v. Watts*, 27 N.E.3d 789, 791 (Ind. Ct. App. 2015)), *trans. denied*.

[13] Our review of a summary judgment motion is limited to those materials designated to the trial court. *Stockton v. Falls Auctioneers and Realtors*, 999 N.E.2d 959, 963 (Ind. Ct. App. 2013) (citing *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001)), *trans. denied*. In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. *Id.* (citing *Catt v. Bd. of Commr's of Knox Cty.*, 779 N.E.2d 1, 3 (Ind. 2002)). Although the trial court's specific findings of fact and conclusions of law assist our review, they are not binding upon us. *Evansville Courier & Press v. Vanderburgh Cty. Health Dept.*, 17 N.E.3d 922, 927 (Ind. 2014).

[14] The Estate argues that what is required by the ELA statute is some action or inaction to be taken which contributes to a release of contamination, that Morse TEC's actions fall within the meaning of the terms, "cause or contribute," and that there is neither a threshold level of action or inaction nor a particular level

of culpability under the ELA statute. Appellant's Brief at 11. The Estate argues, in essence, that Morse TEC "instructed" the users of its machines to discharge chlorinated solvent-contaminated water down the drain, asserts that "[e]very expert witness . . . agrees some PCE went down the drain," and contends that Morse TEC had knowledge that chlorinated solvents were used in its dry cleaning, manufactured the dry cleaning machines "with the understanding that they would be connected to the drain . . . to discharge water that had contained chlorinated PCE," and "did not take any steps to halt the use or discharge of chlorinated solvents from its machines." *Id.* at 14.

[15] Morse TEC argues that the court correctly found that its non-site specific acts of placing dry cleaning equipment in the stream of commerce, with an instruction manual that recommended discharging wastewater to a drain, did not satisfy the requirement of active involvement with the release itself and contends that its conclusion – that Morse TEC did not cause or contribute to the release – is supported by caselaw interpreting two similar federal statutes, the Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation, and Liability Act. Morse TEC also argues that the "limited landlord exception to the 'active involvement' requirement" does not apply and that, apart from the unique case of *JDN Props., LLC v. VanMeter Enters., Inc.*, 17 N.E.3d 357, 360-361 (Ind. Ct. App. 2014), other cases discussing landlord liability have held that even with an on-site presence and general knowledge of spills, a landlord will not be liable in the absence of evidence of active involvement with the release. Appellee's Brief at 26.

[16] Ind. Code § 13-30-9-2 provides:

> A person may, regardless of whether the person caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

[17] The phrase "caused or contributed" is not defined by statute and, as such, the court is to give the words their plain and ordinary meaning. *Reed v. Reid*, 980 N.E.2d 277, 289 (Ind. 2012) (citing *600 Land, Inc. v. Metro. Bd. of Zoning Appeals of Marion Cty.*, 889 N.E.2d 305, 309 (Ind. 2008) (footnote omitted)). Consulting English language dictionaries, the Indiana Supreme Court explained in *Reed* that the word "cause" means "a person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state" and the word "contribute" means, among other things, "to act as a determining factor; share responsibility for something" and concluded that "[e]ach term of the phrase 'caused or contributed' requires some involvement by the actor which produces a result." *Id.* at 289, 289 n.10.

[18] In *Reed*, the defendant entered into an agreed order with the Indiana Department of Environmental Management, acknowledging that it "caused and/or allowed the disposal of solid waste in a manner which created a threat to human health or the environment, when it *disposed of excavated soil* mixed with mill scale, baghouse dust, refractory brick, and other debris" at the

plaintiff's property. *Id.* at 289 (emphasis added). The Indiana Supreme Court noted the agreed order before finding that the plaintiff had carried the initial burden of demonstrating that the defendant "at least 'share[d] responsibility for'" the release of a hazardous substance and concluding that "[o]n the narrow question of whether Forge 'caused or contributed' to the release of chromium—a hazardous substance—there is no dispute of material fact. The Rule 56 materials make clear that Forge at least contributed to the release." *Id.* at 289-290.

[19] Here, unlike in *Reed*, the designated evidence establishes that Morse TEC has not "caused or contributed" to the release of a hazardous substance as contemplated by Ind. Code § 13-30-9-2. The designated portions of the Norge Service Instructions and Parts Catalog, referenced in Williams's March 18, 2011 supplemental responses to Morse TEC's requests for admission, state in part, "NOTE: 1. The following to be Supplied by Others: . . . C. Drain Services from Machines," contain a graphic on the same page with a label which states "TO DRAIN (PER LOCAL BUILDING CODE)," and also indicate under the "Water and Drain Supply Requirements" section that "Each dry cleaning machine must be provided with a separate drain stand for the discharge water . . . . Fabrication of the drain and water facilities will be accomplished on the site. NOTE: This is not waste water." Appellee's Appendix Volume 2 at 176, 181. We further observe that the Estate does not point to any caselaw for the proposition that a mere manufacturer of equipment can be held responsible under Ind. Code § 13-30-9-2. While Williams filed a

third-party complaint against Morse TEC alleging that "representatives of Norge installed some or all of the equipment" and that Morse TEC is the "corporate successor in interest to Borg-Warner that formerly owned and operated the Norge division, including but not limited to the manufacture and installation" of Norge dry cleaning equipment and other cleaning equipment, the record does not establish Morse TEC was involved in any release.[4] Appellant's Appendix Volume 2 at 142.  In his supplemental responses to Morse TEC's requests for admission, Williams admitted that, based upon information and documentation discovered to date, he "had no evidence Norge owned any PCE or solvent containing PCE that was used at the Site at any time."  Appellee's Appendix Volume 2 at 145.  While Williams asserted in his responses to requests for admissions that it was his "understanding that the building was constructed specifically for the Norge Dry Cleaning System and that George Kopetsky worked with Norge on the installation of the Norge Dry Cleaning System," we observe that his August 26, 2011 deposition reveals that he was not present at the premises when the building was constructed or when the machines were installed, that he was not involved in the installation of any

---

[4] To the extent that Williams argues that *Reed's* "some involvement" holding does not "require direct involvement" with the contaminants at issue, contends that Morse TEC had knowledge of the contaminants of concern in this case, and likens this case to *JDN Props., LLC v. VanMeter Enters., Inc.*, 17 N.E.3d 357, 360-363 (Ind. Ct. App. 2014), we observe that the evidence in *JDN Properties*, taken most favorable to the non-movant, demonstrated that the landlord defendant "presumably received rents from [the tenant] while being fully aware that [the tenant's] use of the property was causing petroleum contamination" and that this Court held that "a landlord who has knowledge that a tenant's use of land is causing environmental contamination, but does nothing to halt or remediate such contamination and goes on to sell that property to a third party without disclosing the property's condition, may fairly be said to 'share responsibility' for or contribute to such contamination."  Appellee's Brief at 12.  *JDN Props.*, 17 N.E.3d at 362.  We do not find *JDN Properties* instructive.

equipment, that at the time he acquired the Site all of the equipment was present, that he never had any conversations with Kopetsky at the time of the construction or about the equipment installation, and that he had never met, received a letter from, written to, or talked with "anyone from Norge." *Id.* at 138, 163-164. We further observe that, to the extent that the Estate argues Morse TEC "instructed" the users of its machines to discharge chlorinated solvent-contaminated water down the drain, Williams indicated, in his supplemental responses to Morse TEC's interrogatory items thirteen and fourteen, that he did not recall the names of any "employees or representatives of Norge" with whom he, anyone who owned the Site, operated any dry cleaning business at the Site, or was employed by any such business, had communicated. *Id.* at 146. We conclude that the trial court did not err in granting summary judgment.[5]

[20] For the foregoing reasons, we affirm the entry of summary judgment.

[21] Affirmed.

Bailey, J., and Crone, J., concur.

---

[5] Because we affirm the trial court's August 23, 2017 order for the reasons above, we need not discuss either Morse TEC's argument regarding the applicability of the statute of limitations set out in the Indiana Products Liability Act or those arguments on cross-appeal regarding the court's August 28, 2013 order.