



I N   T H E

# Indiana Supreme Court

Supreme Court Case No. 24S-PL-356

## Andrew Nemeth Properties, LLC and Andrew J. Nemeth,
*Appellants/Plaintiffs,*

–v–

## William A. Panzica, Thomas C. Panzica, Philip E. Panzica, and NP3, LLC,
*Appellees/Defendants.*

Argued: December 5, 2024 | Decided: November 6, 2025

Appeal from the Marshall Circuit Court
No. 50C01-2202-PL-2
The Honorable Curtis Palmer, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 23A-PL-1383

**Opinion by Justice Molter**
Chief Justice Rush and Justices Massa, Slaughter, and Goff concur.

**Molter, Justice.**

Andrew Nemeth is a commercial real estate broker and consultant who undertook a development project with the Panzica brothers—William, Thomas, and Philip—who own an architecture and construction company. Nemeth and the Panzicas planned to form a limited liability company (LLC) to acquire, develop, and lease a piece of commercial real estate so they could share the profits as LLC members.

But they didn't commit their plan to writing, and when they formed the LLC, they didn't sign an agreement or confirmation identifying the LLC's members. Then they had a falling out. The Panzicas accused Nemeth of swindling them into the project and out of a commission by forging the property's purchase agreement. So they backdated an operating agreement omitting Nemeth from the LLC membership. Nemeth denied any forgery, and he complains the Panzicas cut him out of a lucrative development deal that he brought to them.

Nemeth sued for breach of contract and unjust enrichment, but the trial court entered judgment for the Panzicas. Granting summary judgment on the contract claim, the court reasoned that Nemeth was not an LLC member because his interest was not confirmed in writing. Then, after denying Nemeth's jury request, the court conducted a bench trial and denied the unjust enrichment claim. It concluded Nemeth failed to prove his claim, and the unclean hands doctrine barred the claim anyway. Nemeth appealed, and the Court of Appeals reversed.

We granted transfer to answer three questions of first impression: Does becoming an LLC member require either a written agreement or written confirmation? (Yes) Does the constitutional right to a jury trial in civil cases cover unjust enrichment claims for a money judgment? (Yes) Does the unclean hands doctrine apply to those claims? (Yes) Although we agree with the trial court that, as a matter of law, Nemeth was not an LLC member, there remain genuine, material factual disputes over whether the Panzicas breached an agreement to make him one. And Nemeth was also entitled to a jury trial on his unjust enrichment claim. So we vacate the judgment and remand for a jury trial on both claims.

# Facts and Procedural History

## I.    Factual Background

**Nello decides to relocate.** Nello Corporation, which designs and fabricates galvanized steel towers and poles, decided to relocate and consolidate facilities in South Bend. Nemeth played a lead role in that project. He helped Nello secure around $13 million in economic incentives, and after scouting the relocation site, he purchased the land for the new facility. That purchase agreement included a $256,000 broker commission for him.

**Nemeth partners with the Panzicas for the development.** Initially, Nello planned to finance construction and purchase the completed facility. But in July 2014, after Nemeth entered into the purchase agreement for the land, Nello asked him to instead finance the construction, own the facility, and lease it back to Nello. Nemeth agreed to the revised arrangement, and he invited his friend, Bill Panzica, along with Bill's brothers, to partner with him on the project.

According to Nemeth, he and the Panzicas all orally agreed to form a limited liability company as four equal members to purchase the land, construct the facility, and lease it to Nello. He claims they agreed their respective capital contributions would be their professional services—his brokerage and development work, and their architectural and construction expertise—along with the Panzicas' cash contribution for the land acquisition. The Panzicas acknowledge Nemeth and Bill had some discussions largely along those lines, but they claim they never all collectively reached a final agreement.

**Nemeth and the Panzicas organize NP3, LLC to acquire, build, and lease the property to Nello.** In September 2014, Nemeth filed articles of organization for NP3, LLC with the Indiana Secretary of State, listing himself as the registered agent. The "N" in the company name refers to Nemeth and the "P3" refers to the Panzica brothers. But the articles did not identify any members. And there was no written operating agreement—or written agreement of any kind—among the organizers.

About a month later, in October 2014, Nello entered into a fifteen-year lease with NP3. As planned, and to expedite financing, Nemeth assigned his purchase agreement to Panzica Investments, which would later transfer the land to NP3. At that point, the Panzicas didn't know about Nemeth's right to the $256,000 broker commission. And when they asked for a copy of the purchase agreement, Nemeth sent them a version that didn't reflect the commission. The Panzicas claim they didn't learn about the commission until December 2014, when it was too late to withdraw from the project without losing money. So they went ahead and closed on the land purchase and transferred the property to NP3, letting Nemeth keep the commission.

**The Panzicas exclude Nemeth from LLC membership.** The Panzicas allege Nemeth forged the purchase agreement he sent them so that they wouldn't learn that his assignment would entitle them to the $256,000 commission, and he could keep it instead. He denies that. He says he innocently mixed up the versions of the purchase agreement because there were many, and changes to the agreement continued all the way until closing.

Either way, this led the Panzicas to exclude Nemeth from the company, which they argue they could do because they claim they never finalized any agreement. In February 2015, Bill Panzica executed a written operating agreement for NP3 that named Panzica Investments, LLC as the sole initial member, listed each of the Panzicas as managers, and omitted Nemeth. The agreement was backdated to January 1, 2015, and it stated it was effective September 12, 2014, the same day Nemeth had filed the articles of organization.

The Panzicas then saw the project through to completion, and Nello became a paying tenant to NP3.

## II. Procedural History

**Complaint.** Nemeth sued the Panzicas asserting six claims:
(1) declaration of rights and injunction (seeking a declaration that Nemeth holds an interest in NP3 and is entitled to his share of distributions);

(2) action for ownership and distributions from NP3; (3) breach of contract; (4) unjust enrichment; (5) action for compensation as procuring cause for the Nello lease; and (6) conversion. Nemeth also joined as a co-plaintiff Andrew Nemeth Properties, LLC, in which he is a sole member, and he joined NP3 as a co-defendant. Like the parties, we simplify the discussion by referring only to Nemeth and the Panzicas when discussing the parties' claims and arguments.

**Summary Judgment.** Nemeth dropped his conversion claim, and the Panzicas moved for summary judgment on all remaining claims except the unjust enrichment claim. For the first three claims—the membership-based claims, including breach of contract—the trial court concluded there is "no genuine issue of material fact regarding the issue of Mr. Nemeth's failure to be a member of NP3, LLC." App. Vol. 2 at 23. That was because "[t]here is no written operating agreement naming [Nemeth] as a member and there is no written consent from all of the members of the LLC for him to become a member as is required by IC 23-18-6-1(a)(1)." *Id.* That statute says, "a person may become a member in a limited liability company . . . upon compliance with the operating agreement or if the operating agreement does not provide in writing, upon the written consent of all members." Ind. Code § 23-18-6-1(a)(1). For Count 5—procuring cause—the court granted the motion based on its view that there are "no grounds for recovery under Indiana law alleging procuring cause as an independent cause of action." App. Vol. 2 at 23.

**Trial.** Only the unjust enrichment claim remained for trial. Although Nemeth had requested a jury trial, the court sua sponte converted the case to a bench trial because it concluded that Nemeth's only remaining claim of unjust enrichment and the Panzicas' only remaining defense of unclean hands were both equitable claims to be decided by a judge rather than a jury. Following a four-day bench trial, the court entered judgment for the Panzicas, concluding that Nemeth failed to prove his unjust enrichment claim and that the unclean hands doctrine barred the claim anyway.

**Appeal.** Nemeth appealed, challenging the summary judgment on his breach of contract claim and the denial of his jury request on the unjust

enrichment claim. On both issues, the Court of Appeals reversed. *Andrew Nemeth Props., LLC v. Panzica*, 234 N.E.3d 183 (Ind. Ct. App. 2024).

For the breach of contract claim, the court held that Indiana's Business Flexibility Act does not require a written agreement to establish initial LLC membership. The court reasoned that the membership acquisition statute (I.C. § 23-18-6-1) "presupposes the existence of LLC members" and therefore only governs how new members join an existing LLC, not how original members are established when forming the LLC. *Id.* at 189. Since the Act requires LLCs to have at least one member at formation but contains no specific provision addressing initial membership, the court concluded there is a statutory gap. *See id.* at 190. Given the Act's stated policy of giving "maximum effect to the principle of freedom of contract," I.C. § 23-18-4-13, the court held that a pre-formation oral contract can establish initial membership, *Andrew Nemeth Props., LLC*, 234 N.E.3d at 190. And the court found genuine issues of material fact regarding whether Nemeth and the Panzicas orally agreed to form NP3 as equal members. *Id.*

For the jury demand, the court held that Nemeth's unjust enrichment claim seeking money damages was a legal claim subject to a jury right under Article 1, Section 20 of the Indiana Constitution. *Id.* at 192–93. That analysis turns on whether the claim was considered legal or equitable when Indiana adopted its 1851 constitution, and the court concluded that unjust enrichment claims based on contract implied-at-law, quasi-contract, and quantum meruit theories were "triable at law and not in equity" when the plaintiff sought a money judgment. *Id.* at 192. The court also held that the equitable defense of unclean hands had not "crossed over to be available as a defense to a legal claim" despite Indiana's merger of law and equity. *Id.* at 193.

The Panzicas petitioned for transfer, which we granted, 244 N.E.3d 904 (Ind. 2024), thus vacating the opinion of the Court of Appeals, Ind. Appellate Rule 58(A).[1]

# Discussion and Decision

Nemeth challenges two trial court rulings. The first is the summary judgment for the Panzicas on his breach of contract claim, and the second is the denial of his jury request for his unjust enrichment claim. Both decisions present only legal issues we consider de novo. *Thomas v. Valpo Motors, Inc.*, 258 N.E.3d 236, 239–40 (Ind. 2025) (summary judgment); *State v. $2,435 in U.S. Currency*, 220 N.E.3d 542, 545 (Ind. 2023) (jury right). And like the Court of Appeals, we reverse as to both, although for somewhat different reasons.

In Part I below, we explain that while we agree with the trial court that LLC membership requires a writing, there remain material factual disputes about whether the Panzicas breached an agreement to make Nemeth a member, so summary judgment on the contract claim was mistaken. In Part II, we explain that Nemeth had a right to present his unjust enrichment claim to a jury because the claim is legal rather than equitable.

## I.  Nemeth's Breach of Contract Claim

Nemeth alleges he entered into an oral agreement with the Panzicas to "form a limited liability company under the name NP3, LLC as four (4) equal owners ('members') to purchase and own the real estate, construct the office building and operations plant for Nello Corporation and lease the office building and operations plant to Nello Corporation." App. Vol.

---

[1] We are grateful for the insightful amicus briefs we received from the Indiana Trial Lawyers Association, Indiana Business Law Attorneys, and Defense Trial Counsel of Indiana.

2 at 54, ¶ 46. Then, he says, the Panzicas breached their agreement in one of two ways.

He first alleges that the parties' oral agreement made him an LLC member, and the Panzicas breached their contract by kicking him out of the company through a backdated written operating agreement that excluded his membership interest. As we explain below, we agree with the trial court and the Panzicas that this claim fails as a matter of law. In short, Indiana's Business Flexibility Act requires a writing for LLC membership, and it is undisputed that Nemeth and the Panzicas never executed a written operating agreement or written consent giving him an interest. Because Nemeth was never a member to begin with, the Panzicas could not have breached a contract by removing him from the company.

That leads to Nemeth's alternative argument, which we analyze next. If the Panzicas never made him a member, he says, then that breached their agreement to make him one. The Panzicas respond that this argument fails because there was never an agreement between Nemeth and all (rather than one) of the Panzica brothers, and any agreement didn't cover all the material terms, like the value of each person's capital contribution. But those are disputed facts. Nemeth's testimony is that they all reached an agreement covering all the material terms, and he has other evidence to support his claim too. Because there are disputed material facts, the Panzicas were not entitled to summary judgment.

## A. LLC membership requires a writing.

Indiana's Business Flexibility Act governs the creation and operation of limited liability companies—LLCs. I.C. §§ 23-18-1-1 to 23-18-13-2. LLCs are unincorporated associations organized under the Act for any business, personal, or nonprofit purpose. I.C. §§ 23-18-1-11, 23-18-2-1(a)(1). "The benefit of a limited liability company is that it provides individuals the same [liability] protection enjoyed by shareholders of a corporation through creation of a distinct legal entity while at the same time featuring pass-through taxation similar to that enjoyed by partners." 3 Ind. Law Encyc. Associations, Clubs, & Societies § 23.

LLC owners—the analogs to shareholders and partners—are referred to as "members." The Act defines a "member" as someone who has complied with the Membership Statute, I.C. § 23-18-6-1, and has not disassociated from the company. I.C. § 23-18-1-15. The Membership Statute offers two paths to membership. One is by "acquiring an interest directly from the limited liability company" (the direct acquisition provision). I.C. § 23-18-6-1(a)(1). The other is as "an assignee of an interest" (the assignment provision). I.C. § 23-18-6-1(a)(2) (cross-referencing I.C. § 23-18-6-4, -4.1).

Nemeth claims ownership through the direct acquisition provision, and the parties disagree over two aspects of that provision. Their first disagreement is over whether the direct acquisition provision requires a writing. Their second disagreement is over whether the direct acquisition provision applies only to members who join after an LLC is formed, or whether it also applies to original members, as Nemeth claims to be, who form the LLC.

We address each issue in turn.

### 1. Becoming an LLC member requires a written agreement or written confirmation.

The direct acquisition provision says that one becomes a member "upon compliance with the operating agreement or *if the operating agreement does not provide in writing*, upon the written consent of all members." I.C. § 23-18-6-1(a)(1) (emphasis added). The parties' disagreement is over how to interpret the italicized phrase. The Panzicas read the phrase as clarifying that the first option refers only to a written operating agreement, not an oral agreement. So if there is a written operating agreement, a prospective member must follow that, and if there isn't, then they must get written consent. Those are the only options. Both require a writing, so neither offers an option to comply with an oral operating agreement.

Nemeth argues the phrase instead conditions the second option but says nothing about the first option. And because the Act generally permits

both written and oral operating agreements, either suffices to create a membership interest through the first option. I.C. § 23-18-1-16 ("'Operating agreement' means any written or oral agreement of the members as to the affairs of a limited liability company and the conduct of its business that is binding upon all the members."). In other words, if there is a written operating agreement, a prospective member must follow that. But if there isn't, they can either comply with an oral operating agreement or obtain written consent. And because there was no written agreement here, Nemeth could establish his membership through an oral agreement, he argues.

Both interpretations are reasonable, so we must resolve the ambiguity by deciding which is better. *Young v. Hood's Gardens, Inc.*, 24 N.E.3d 421, 425 (Ind. 2015). And for three reasons, we conclude the Panzicas propose the better interpretation.

### a. The Panzicas' interpretation better aligns with other provisions in the Act.

First, the Panzicas' interpretation more closely aligns with the policy choice to require a writing that the legislature codified in the Membership Statute's other provisions and the Act's other membership-related statutes. *See Stout v. Bd. of Comm'rs of Grant Cnty.*, 8 N.E. 222, 224 (Ind. 1886) ("[A]cts *in pari materia* . . . may be referred to in order to discern the intent of the legislature in the use of particular terms, or in the enactment of particular provisions . . . ."); Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539 (1947) ("Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes . . . ."). Most tellingly, the direct acquisition provision uses language very similar to the assignment provision, and the assignment provision is unambiguous. It requires a writing by saying "an assignee of an interest may become a member only if the other members unanimously consent," and "[t]he consent of a member may be evidenced in any manner specified in *writing* in an operating agreement, but in the absence of a specification, consent must be evidenced by a *written* instrument, dated and signed by the member." I.C. § 23-18-6-4(b)

(emphases added). There is one exception: "[e]xcept as otherwise provided in a *written* operating agreement." I.C. § 23-18-6-4(b) (emphasis added).

We see no indication that the legislature meant to treat obtaining a membership interest from the company differently than obtaining an interest through assignment when it comes to a writing requirement. Instead, we think the legislature's use of similar language in statutory provisions with a similar purpose suggests it meant to treat both scenarios the same—both direct acquisitions and assignments require a writing.

That interpretation is also consistent with the policy decisions the legislature codified in other membership-related statutes requiring a writing. The Act requires the company to maintain "a writing" reflecting the cash, property, or services each member contributes "[u]nless otherwise set forth in a written operating agreement." I.C. § 23-18-4-8(a)(5). And the company must keep a list of each member "from the date of organization." I.C. § 23-18-4-8(a)(1). One purpose for these provisions is to protect creditors, which further aligns with requiring written confirmation for membership so that creditors can be sure who owns the company. J. William Callison & Maureen A. Sullivan, *Limited Liability Companies: A State-by-State Guide to Law and Practice* § 1:2 (2025) ("Because LLC members are protected from the LLC's debts and obligations, the state LLC statutes typically protect creditors by requiring disclosure of members' agreed-upon contributions to the LLC . . . .").

### b. The Panzicas' interpretation is consistent with other states' more clearly written statutes.

Second, the Panzicas' interpretation is consistent with other states' statutes that use very similar wording but with syntax more clearly requiring a writing. *See, e.g.,* Ga. Code Ann. § 14-11-505(b) ("[A] person is admitted as a member of the limited liability company at the time provided in and upon compliance with the articles of organization and any written operating agreement or, if the articles of organization or a

written operating agreement does not so provide, upon the consent of all members and when the person's admission is reflected in the records of the limited liability company."); Mass. Gen. Laws Ann. ch. 156C, § 20(b)(1) ("[I]n the case of a person acquiring a limited liability company interest directly from the limited liability company, at the time provided in and upon compliance with a written operating agreement or, if a written operating agreement does not so provide, upon the consent of all members."). We think it is likely that the close similarity between Indiana's statute and other states' statutes reflects that our legislature made the same policy choice as those other states but just didn't choose its words quite as carefully. *See* 2B Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 52:3 (7th ed.) ("Legislation in other states and jurisdictions may help guide the interpretation of a doubtful statute which pertains to the same subject matter, persons, things, or relations.").

### c. Limited evidence of the original public meaning supports the Panzicas' interpretation.

Third, the Panzicas' interpretation is how business lawyers described the new law when it was enacted. *See* David C. Worrell & Marci A. Reddick, *The Indiana Business Flexibility Act (Limited Liability Companies)*, 27 Ind. L. Rev. 919, 934 (1994) ("A person may become a member of the LLC upon compliance with the terms of the operating agreement, or if the operating agreement is not in writing, upon the written consent of all members."). We don't give this point much weight because the single law review article doesn't necessarily reflect a widely held understanding of the statute's meaning. *Cf. McBrien v. Warden, State Prison*, 216 A.2d 432, 438 (Conn. 1966) ("A construction by bench and bar alike over such a long period is entitled to great weight."). But it is still some indication of which interpretation more accurately reflects how the public understood what the legislature was trying to convey at the time.

In sum, we construe the direct acquisition provision to mean that an aspiring member may acquire an interest from the company only by:

(1) complying with the membership terms in a written operating agreement, or (2) if there is no such written operating agreement with membership terms, then through the written consent of all members. Because it is undisputed there was no written operating agreement and no written consent, Nemeth, as a matter of law, was not a member.

## 2. The direct acquisition provision applies both to original members and later-added members.

Nemeth next argues that our conclusion that he wasn't a member under the direct acquisition provision makes no difference. That is because, he says, the direct acquisition provision covers only *new* members after the company was formed, not the *original* members who formed the company. For original members, he argues, there is no statutory provision that governs and general contract law—including the law of oral contracts—governs instead, so he can establish his membership by proving that the Panzicas orally agreed to include him.

The direct acquisition provision begins by saying it applies "in the case of a person acquiring an interest directly from the limited liability company." I.C. § 23-18-6-1(a)(1). Nemeth makes two primary points in support of his claim that the statute doesn't apply to original members. The first is that there can be no LLC without members, I.C. § 23-18-9-1.1(c), so original members are necessary before there is an LLC to "acquir[e] an interest directly from," I.C. § 23-18-6-1(a)(1). Relatedly, the statute requires the written consent of all members, so there must first be original members from whom to obtain consent.

The Panzicas read the provision as instead governing membership for both original members and members who are later added. They argue that the reference to obtaining the consent of all members does not imply there must be some prior group of members. Rather, requiring the written consent of all members "is a perfectly reasonable way to refer to a written agreement *establishing* initial membership" among those who are forming the LLC. Pet. to Trans. at 9 (emphasis in original). Again, three reasons lead us to agree with the Panzicas.

### a. The Act's "member" definition does not distinguish between original and new members.

First, the Act is unambiguous that to become a member there is no distinction between original members and later added members. The Act's "member" definition identifies only the Membership Statute as a route to membership. I.C. § 23-18-1-15 ("'Member' means a person admitted to membership in a limited liability company under IC 23-18-6-1 and as to whom an event of dissociation has not occurred."). And neither the definition nor the Membership Statute refers or alludes to a distinction for original members. *See WTHR-TV v. Hamilton Se. Schs.*, 178 N.E.3d 1187, 1191 (Ind. 2022) ("When the General Assembly has defined a statutory term, we are bound by its definition.").

That appears intentional. Indiana's statutes for limited partnerships include a statute that is almost identical to the Membership Statute, but it begins by saying it applies only "[a]fter the formation of a limited partnership." I.C. § 23-16-4-1. The Business Flexibility Act omits this limitation, and it does not anywhere suggest a distinction between original and later-added members. In other words, it's clear from section 23-16-4-1 that the legislature sometimes wishes to differentiate between initial and later-added owners, but it chose not to do so in the Business Flexibility Act. *Cf. D.W. v. State*, 263 N.E.3d 151, 160 (Ind. 2025) ("[T]he Legislature knows how to draft a statute in such a way as to except particular items from coverage; where it does not do so, it does not intend for there to be an exception.").

### b. The Membership Statute's timing provision covers original members.

Second, the Membership Statute's timing provision confirms the statute covers original members. It says that "[t]he effective time of admission of a member to a limited liability company is the" latest of the "*date the limited liability company is organized*," the "time provided in the operating agreement," or "when the person's admission is reflected in the records of

the limited liability company." I.C. 23-18-6-1(b) (emphasis added). If the date the company is organized may be the latest date for admission, then the provision must govern when the company is formed, which means it covers original members. To illustrate further, Delaware's statute uses very similar language, and it specifically references original LLC members at formation. Del. Code Ann. tit. 6, § 18-301(a) ("In connection with the formation of a limited liability company, a person is admitted as a member of the limited liability company upon the later to occur of: (1) The formation of the limited liability company; or (2) The time provided in and upon compliance with the limited liability company agreement or, if the limited liability company agreement does not so provide, when the person's admission is reflected in the records of the limited liability company or as otherwise provided in the limited liability company agreement.").

### c. The legislature has not amended the Act to track other model acts that have more recently been amended to distinguish between original and later-added members.

Third, the legislature has not amended the Membership Statute even though the provision in the ABA's prototype act that is the template for Indiana's statute has since been revised to distinguish between becoming an original member at formation and becoming an additional member later. 3 Ribstein & Keatinge on Limited Liability Companies app. G (2025). The Uniform Law Commission's Uniform LLC Act has undergone a similar evolution. Its first iteration didn't discuss how to become a member at all. *Id.* app. D-2. Now it distinguishes between becoming a member at different phases, including distinguishing between becoming a member at formation and becoming a member later. *Id.* app. F.

We take from the legislature's inaction that, so far at least, it has not embraced this momentum towards Nemeth's view that the Act should distinguish between original and later-added members. When Indiana enacted the Business Flexibility Act, there was some expectation that the

law might evolve with these model statutes and national trends. Early commentators observed:

> Although the Act may represent the 'latest word' in Indiana business associations, it does not represent the 'last word.' Changes to the Act may be considered to incorporate features of other state's LLC acts or to address shortcomings that will come to light in practice. Ultimately, it may make most sense for Indiana and other states with LLC statutes to adopt a uniform act, such as that being developed by the National Conference of Commissioners on Uniform State Laws, to realize the full potential of this newest species of business association, the limited liability company.

Worrell & Reddick, *supra* at 941. But the legislature has declined to revise the Membership Statute to distinguish between original and later-added members. And we can't revise their statutes for them. That "would run afoul of our constitutional separation-of-powers because it is the legislature that writes and revises statutes while we merely interpret and apply them." *Ind. Right to Life Victory Fund v. Morales*, 217 N.E.3d 517, 524 (Ind. 2023); *see also Calvin v. State*, 87 N.E.3d 474, 478 (Ind. 2017) ("The courts cannot venture upon the dangerous path of judicial legislation to supply omissions or remedy defects in matters committed to a co-ordinate branch of the government." (quoting *R.R. Comm'n of Ind. v. Grand Trunk W. R.R.*, 100 N.E. 852, 855 (1913))).

Because the Membership Statute applies to all members—original and later-added members—and it is undisputed that Nemeth cannot satisfy the statute's requirement of a writing, the trial court was correct to conclude that Nemeth is not a member as a matter of law. Even so, Nemeth argues that just presents a different breach: the Panzicas breached an agreement to make Nemeth a member. We address that argument next.

## B. Factual disputes preclude summary judgment on Nemeth's claim that the Panzicas breached a contract to make him a member.

Though Nemeth can't prove he was a member, he claims he can still prove he and the Panzicas agreed he was *supposed* to become one. So, he argues, by excluding him from membership, the Panzicas broke their promise to make him a member.

We agree that Nemeth should be permitted to present his claim to the jury. Under our summary judgment standard, the "moving party is entitled to summary judgment only if the evidence it designates in support of its motion 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Cave Quarries, Inc. v. Warex LLC*, 240 N.E.3d 681, 684–85 (Ind. 2024) (quoting Ind. Trial Rule 56(C)). In that analysis, we "view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences for the nonmovant." *Id.* at 685. "[T]he purpose of summary judgment is to withdraw issues from the jury only when there are no factual issues for the jury to decide," *id.*, but here, there are genuine factual disputes.

Nemeth points to several pieces of evidence (from which the jury could also draw favorable inferences) to support his claim that he and the Panzicas all orally agreed that he would become a member sharing an equal interest in the company in exchange for his professional services in bringing this multi-million-dollar deal together. That begins with his own deposition testimony to that effect. *Hughley v. State*, 15 N.E.3d 1000, 1002 (Ind. 2014) (holding that even self-serving testimony may defeat summary judgment if a jury could properly return a verdict based on that testimony). And he points to plenty of other evidence corroborating his testimony:

- At Nemeth's suggestion, the company was named after him, with the "N" referring to Nemeth and the P3 referring to the three Panzica brothers.

- Nemeth is the one who filed the articles of organization, which also identified him as the registered agent.

- Bill Panzica testified that when they met with a banker in August 2014 to discuss financing, "the intent" was that "Mr. Nemeth would be part of NP3." App. Vol. 4 at 56:25–57:16.

- On behalf of NP3, Bill Panzica signed a lease with Nello, and that lease identified Nemeth as one of the LLC's members.

- Bill Panzica emailed his insurer stating that "[t]he new LLC is NP3, LLC (Panzica Investments and Andrew Nemeth)." App. Vol. 4 at 225.

- Bill Panzica emailed a title company representative that NP3 was Nemeth and the three Panzica brothers.

- Nemeth personally guaranteed a loan commitment to Panzica Investments, LLC, which he says he would not have done if they hadn't agreed he would be a part of NP3.

- A bank's written loan presentation dated February 12, 2015 for a construction loan to NP3 lists Nemeth and each of the Panzicas as 25% owners of NP3.

The Panzicas respond that this claim fails because the "undisputed evidence demonstrates that there was never mutual assent between the parties on Mr. Nemeth's capital contribution or allocation of profits/losses." Appellee's Br. at 25. But to the contrary, those are hotly disputed facts. Nemeth's testimony is that they all agreed to equal interests and that his capital contribution was his professional services in finding the tenant, negotiating a long-term lease with Nello, inviting the Panzicas to partner with him, and assigning the purchase agreement he negotiated with the landowner to allow NP3 to construct the facility. Because that is a genuine dispute over material facts, the Panzicas were

not entitled to summary judgment, and Nemeth is entitled to present his claim to the jury. *Madison Cnty. Bank & Tr. Co. v. Kreegar*, 514 N.E.2d 279, 281 (Ind. 1987) ("Granting summary judgment is not proper if the court must weigh conflicting evidence to reach a decision.").

Of course, a jury may ultimately see this evidence differently than Nemeth. It may agree with the Panzicas that while they all had a rough idea of how they planned to go into business together through an LLC, they never finalized an agreement on all the material terms. If that is the jury's view, then Nemeth believes he should still recover for the Panzicas' unjust enrichment at his expense, which we discuss next.

## II.  Nemeth's Unjust Enrichment Claim

If Nemeth's contract claim fails at trial, then he claims in the alternative that he should recover for unjust enrichment. That claim "requires a party who has been unjustly enriched at another's expense to make restitution to the aggrieved party." *Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012). To prevail, the plaintiff must show "that he rendered a benefit to the defendant at the defendant's express or implied request, that the plaintiff expected payment from the defendant, and that allowing the defendant to retain the benefit without restitution would be unjust." *Id.* Nemeth alleges he rightfully expected compensation when his efforts led to the Panzicas (1) acquiring real estate and a building worth more than their acquisition costs, and (2) earning lease proceeds from Nello.

The trial court rejected Nemeth's request to submit his claim to a jury and then rejected his claim. The court rejected the claim for two reasons. The first was that it concluded Nemeth did not satisfy his burden of proof. The second was that it concluded the doctrine of unclean hands defeated the claim. Nemeth argues that it was for the jury rather than the judge to decide his claim. The Panzicas disagree, and they argue the mistake was harmless anyway.

We agree with Nemeth, as we discuss next.

## A. Jury Right

The Indiana Constitution provides that "[i]n all civil cases, the right of trial by jury shall remain inviolate." Ind. Const. art. 1, § 20. That doesn't mean juries can decide all claims though. "Drawing as we do from English common law roots and England's symbiotic system of law courts and equity courts, it is a well-settled tenet that a party is not entitled to a jury trial on equitable claims." *Songer v. Civitas Bank*, 771 N.E.2d 61, 63 (Ind. 2002). So whether a party can insist that a jury rather than a judge decide a claim depends on whether, when Indiana enacted its Constitution in 1851, Indiana classified the claim as legal (and thus previously decided by English common law courts) or equitable (and thus previously decided by the English Court of Chancery). *State v. $2,435 in U.S. Currency*, 220 N.E.3d 542, 545 n.1 (Ind. 2023).

Nemeth's claim was considered legal. Unjust enrichment claims are a species of quasi-contract claims. *Reed*, 980 N.E.2d at 296; *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991). Those are "a legal fiction invented by the common-law courts in order to permit a recovery by the contractual remedy of assumpsit in cases where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise." *Clark v. Peoples Sav. & Loan Ass'n of DeKalb Cnty.*, 46 N.E.2d 681, 682 (Ind. 1943); *see also Bd. of Comm'rs of Decatur Cnty. v. Greensburg Times*, 20 N.E.2d 647, 648 (Ind. 1939) (recognizing that quasi-contract claims "were ordinarily enforced at common law in the same form of action (assumpsit) that was appropriate to true contracts" (quotations omitted)). In those circumstances, "common-law courts have supplied the fiction of the promise in order to permit the remedy." *Clark*, 46 N.E.2d at 682; *see also Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009) ("A claim for unjust enrichment is a legal fiction invented by the common law courts in order to permit a recovery where the circumstances are such that under the law of natural and immutable justice there should be a recovery." (cleaned up)).

When plaintiffs seek a money judgment for unjust enrichment rather than equitable relief (e.g., a constructive trust, equitable lien, or

subrogation), our appellate courts have long held those are legal claims that juries can decide. *McKinney v. Springer*, 6 Blackf. 511, 514–15 (Ind. 1843); *Nehi Beverage Co. of Indianapolis v. Petri*, 537 N.E.2d 78, 85 (Ind. Ct. App. 1989). That is why we have a pattern jury instruction for them. Ind. Pattern Jury Instruction No. 3317 (2024).

Leading treatises agree. For example, a Restatement explains that "[t]he standard legal remedy for a liability based on unjust enrichment is a judgment for money, to be satisfied from the assets of the defendant by the ordinary procedures of execution." Restatement (Third) of Restitution and Unjust Enrichment § 4 cmt. d (A.L.I. 2011). And "[i]f restitution to the claimant is accomplished exclusively by a judgment for money, without resort to any of the ancillary remedial devices traditionally available in equity but not at law, the remedy is presumptively legal." *Id.*; *see also* 1 Corbin on Contracts § 1.20 n.8 (rev. ed. 2024) (explaining that the Indiana Court of Appeals' decision in *Nehi* "quite correctly ruled that, whatever the terminology, the action was at law and not in equity, thereby triable by jury"); Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies*, 109 (3d ed. 2018) ("These claims are claims at law in every sense, first because they seek simply money relief, and second because they were historically brought in the separate law courts."); 1 Am. Jur. 2d Actions § 13 ("Furthermore, a claim for assumpsit has been described generally as an action at law to enforce a quasi-contract and the action sounds in unjust enrichment.").

Disagreeing, the Panzicas point to cases describing unjust enrichment as an equitable theory. *See, e.g.*, *Galanis v. Lyons & Truitt*, 715 N.E.2d 858, 861 (Ind. 1999) ("Quantum meruit is an equitable doctrine that prevents unjust enrichment by permitting one to recover the value of work performed or material furnished if used by another and if valuable." (quotations omitted)). That confuses the claim's classification with the theory for creating it. Unjust enrichment "is but the equitable *reason* for requiring payment for value of goods and services received." *Nehi*, 537 N.E.2d at 85 (emphasis in original). But "[t]he theory of a case claiming a defendant has been unjustly enriched may be either legal or equitable" depending on the remedy the plaintiff seeks. *Id.* Quasi-contracts "are legal fictions created by courts of law." *Id.* And when plaintiffs sought the legal

remedy of a money judgment for unjust enrichment claims, the claims "were triable at law and not in equity, thus one is entitled to jury trial upon them." *Id.*

Even so, the Panzicas argue that while Nemeth sought a money judgment, his complaint did not limit his claims to that relief. But once the case was narrowed to Nemeth's only remaining claim of unjust enrichment, he made clear he was seeking a money judgment only. He made that clear during the final pretrial conference discussion of jury instructions (before the trial court sua sponte converted the trial to a bench trial) and again on the first day of trial. Neither time did the Panzicas respond with surprise or concern that Nemeth was seeking only a money judgment.

Yet they argue that the trial isn't the juncture that matters, and instead we must consider the full breadth of Nemeth's complaint, which sought other forms of relief, including equitable relief. We don't see why. Our analysis turns on whether Nemeth's sole remaining claim of unjust enrichment was one for a money judgment, and that analysis is not informed by the five earlier claims that he lost or abandoned.

Because Nemeth's unjust enrichment claim for a money judgment is a legal claim, he has a constitutional right to present it to a jury.

## B.  Unclean Hands Defense

The Panzicas argue that any error in not allowing Nemeth to present his unjust enrichment claim to a jury is harmless because the judge concluded the Panzicas' unclean hands defense defeated Nemeth's claim anyway. Nemeth responds that unclean hands is an equitable defense available only for claims to equitable relief, not claims like unjust enrichment, which seek only legal relief through a money judgment. We agree with the Panzicas that unclean hands is a defense available for unjust enrichment claims regardless of whether the plaintiff seeks legal or equitable relief. But still, the error wasn't harmless because the jury—not the judge—must decide that defense in this case.

To explain, we first provide an overview of the unclean hands doctrine. We then discuss the competing views over whether the unclean hands defense can apply to claims for legal relief. Next, we explain that two points of agreement between the parties—(1) that there is a corollary legal defense of "in pari delicto," and (2) that the propriety of Nemeth's conduct is properly considered as one of the elements of his claim—lead us to conclude that the Panzicas can assert an unclean hands defense to Nemeth's unjust enrichment claim. And finally, we explain that the jury, rather than the judge, must decide Nemeth's unclean hands defense.

### 1. Overview of Unclean Hands

The "unclean-hands doctrine" refers to the maxim "that one who comes into equity must come with clean hands, or, as sometimes expressed, 'He that hath committed iniquity shall not have equity.'" *Pittsburgh, C., C. & St. L. Ry. Co. v. Town of Crothersville*, 64 N.E. 914, 914 (Ind. 1902). This is not "a free-floating, bad-person defense based on conduct wholly unconnected to the facts of the case." *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 484 (Del. Ch. 2022). Rather, for the doctrine to bar a claim, the plaintiff's wrongdoing must (1) be intentional, and (2) "have an immediate and necessary relation to the matter being litigated." *Hardy v. Hardy*, 910 N.E.2d 851, 856–57 (Ind. Ct. App. 2009).

Protecting the integrity of our judicial system is the doctrine's primary purpose. *Eldridge v. Eldridge*, 710 A.2d 757, 764 (Conn. 1998) ("The clean hands doctrine is applied not for the protection of the parties but for the protection of the court." (quotations omitted)). It shields courts from claims that would require them to condone or secure the fruits of wrongdoing. *See Rubin v. Est. of Warner*, 881 F. Supp. 23, 25 (D.D.C. 1995) ("The doctrine of unclean hands is designed to preserve the integrity of the Court by protecting it from exercising its powers to aid those who are before the Court as a result of their own fraudulent behavior."); 30A C.J.S. Equity § 111 (2025) ("The clean hands doctrine is intended to protect the courts from having to endorse or reward inequitable conduct."). Otherwise, "allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system."

*Brewster v. City of Los Angeles*, 672 F. Supp. 3d 872, 1003 (C.D. Cal. 2023); *Olmstead v. United States*, 277 U.S. 438, 484 (1928) (Brandeis, J., dissenting) (The court's "aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination."), *overruled by Berger v. New York*, 388 U.S. 41 (1967), *and overruled by Katz v. United States*, 389 U.S. 347 (1967).

To illustrate, imagine Husband secretly transfers marital assets to Brother with Brother's promise to return them after Husband's divorce is final—a fraudulent scheme to reduce Wife's share of the property division. If Brother refuses to return the assets to Husband, Husband would generally have a claim against Brother for a constructive trust. Restatement (Third) of Restitution and Unjust Enrichment § 63 cmt. b (A.L.I. 2011) (Illustration Number 4). But most courts, relying on the unclean hands doctrine, would decline to provide any relief because Husband's claim stemmed from his own fraud. *Id.* Even though Brother was unjustly enriched, the court will not facilitate returning the assets to Husband because the court will neither condone nor aid his deceitful scheme to cheat Wife.

The Panzicas claim Nemeth's hands are similarly soiled. They argue he is seeking restitution for the proceeds of a deal that he tricked them into by forging a purchase agreement. But Nemeth not only denies the forgery allegation, he claims this defense is unavailable because he is seeking only a money judgment, not equitable relief.

### 2. Unclean Hands Defense to Legal Relief

Courts and commentators are deeply divided over whether the unclean hands defense is limited to equitable relief or whether it applies to legal relief too. The "orthodox view" is that the defense can bar only equitable relief. Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies*, 67 (3d ed. 2018). That is because the English chancellors developed the doctrine as a discretionary basis for them to deny relief, and they only had power to grant equitable rather than legal relief. They also didn't go a step further to enjoin the claimant from pursuing legal relief in the common law

courts, and the common law courts didn't recognize the doctrine as a basis for declining legal relief. *Aizen*, 285 A.3d at 487; *see also* T. Leigh Anenson, *Announcing the "Clean Hands" Doctrine*, 51 U.C. Davis L. Rev. 1827, 1851 (2018) ("Historically, the defense applied to all equitable relief, but only equitable relief."). There is broad support for this view. T. Leigh Anenson, *Treating Equity Like Law: A Post-Merger Justification of Unclean Hands*, 45 Am. Bus. L.J. 455, 467–69 (2008) (collecting authority).

But many disagree. *Id.* (collecting authority); Restatement (Third) of Restitution and Unjust Enrichment § 63 cmt. a (A.L.I. 2011) ("[Unclean hands] is not restricted to claims that seek traditional forms of equitable relief; it may be interposed against claims that derive from the legal side of restitution as well."). The competing view is that because judicial systems like Indiana's have merged law and equity, it shouldn't make any difference whether a doctrine developed in law or equity. Douglas Laycock, *The Triumph of Equity*, 56 Law & Contemp. Probs. 53, 53–54 (1993); *see also Olmstead*, 277 U.S. at 483–84 (1928) (Brandeis, J., dissenting) ("The maxim of unclean hands comes from courts of equity. But the principle prevails also in courts of law."). Instead, the argument goes, debate should center on whether doctrines—legal or equitable—best serve our legal system today, not on how medieval monarchs ran their courts. Laycock, *supra*, at 53–54.[2] And besides, even before law and equity merged, law routinely evolved to absorb equity. Fleming James, Jr., *Right to a Jury Trial in Civil Actions*, 72 Yale L.J. 655, 679 (1963) ("Many matters which were cognizable only in equity in remote times came to be

---

[2] *See also* T. Leigh Anenson, *Treating Equity Like Law: A Post-Merger Justification of Unclean Hands*, 45 Am. Bus. L.J. 455, 458 (2008) ("Because the historic boundary between law and equity was accidental and not functional, functional choices about the role of discretion, the method of adjudication, or an award of damages or specific performance should be considered outwardly and independently on their merits."); William J. Lawrence, III, *The Application of the Clean Hands Doctrine in Damage Actions*, 57 Notre Dame Law. 673 (1982) (arguing that unclean hands should be an available defense to legal claims); *Byron v. Clay*, 867 F.2d 1049, 1052 (7th Cir. 1989) ("But with the merger of law and equity, it is difficult to see why equitable defenses should be limited to equitable suits any more; and of course many are not so limited, and perhaps unclean hands should be one of these." (citation omitted)).

recognized as defenses by courts of law—worked over into law as we say—in the course of time.").[3]

### 3. Unclean Hands Defense to Nemeth's Unjust Enrichment Claim

We join the camp that concludes unclean hands is an available defense to an unjust enrichment claim even when the plaintiff seeks a money judgment. And we base our conclusion on two points where the parties agree.

The first is that they agree there is a corollary legal defense, known as "in pari delicto," that the common law courts recognized. *Ervin v. State ex rel. Walley*, 48 N.E. 249, 252 (Ind. 1897) ("Because of the parties to the bet being in pari delicto, the common law would leave them where they had placed themselves.").[4] Pet. to Trans. at 15–16; Resp. to Trans. at 20–21. "The equitable defense of in pari delicto, which literally means 'in equal fault,' is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). While the defense was originally "limited to situations where the plaintiff bore at least substantially equal responsibility for his injury,"

---

[3] *See also Aizen*, 285 A.3d at 485–86 ("The assimilation of equitable principles by the law courts and the procedural merger of law and equity have produced a legal system in which most equitable defenses are available in actions at law."); Laycock, *supra*, at 81 ("Equity has triumphed in the sense that most of its innovations are now accepted parts of our law."); T. Leigh Anenson, *Treating Equity Like Law: A Post-Merger Justification of Unclean Hands*, 45 Am. Bus. L.J. 455, 464 (2008) ("Defenses like fraud, duress, illegality, unconscionability, and accommodation derived from equity but were converted to law and often considered legal defenses. Others retained their equitable designation but were routinely recognized in actions at law. Such equitable defenses included estoppel, waiver, rescission, ratification, and acquiescence. Consequently, over hundreds of years, equity had made inroads in the law and resulted in its modification and amenability to notions of fairness and justice.").

[4] *See generally* 30A C.J.S. Equity § 113 (2025) ("In pari delicto is a corollary of the clean hands maxim."); 27A Am. Jur. 2d Equity § 24 (2025) ("A maxim that is closely related to, and that has been described as a corollary of, the clean-hands maxim is 'in pari delicto,' which literally means "in equal fault."); *Schlueter v. Latek*, 683 F.3d 350, 355 (7th Cir. 2012) ("When as in such cases the plaintiff is asking for equitable relief, the *in pari delicto* defense is referred to as the unclean-hands defense.").

"[c]ontemporary courts have expanded the defense's application to situations more closely analogous to those encompassed by the 'unclean hands doctrine,' where the plaintiff has participated in some of the same sort of wrongdoing as the defendant." *Id.* (quotations omitted).[5] Now, the defenses have essentially merged, and "the label doesn't matter." *Schlueter v. Latek*, 683 F.3d 350, 355 (7th Cir. 2012).

The second point of agreement between the parties is that Nemeth's conduct must be considered when deciding the merits of his unjust enrichment claim. "To prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991). That evaluation of what is just includes considering the Panzicas' forgery allegation. For "[r]ecovery in restitution to which an innocent claimant would be entitled may be limited or denied because of the claimant's inequitable conduct in the transaction that is the source of the asserted liability." Restatement (Third) of Restitution and Unjust Enrichment § 63 (A.L.I. 2011); *Aizen*, 285 A.3d at 489 ("[A]t least one legal camp has concluded that today, unclean hands really just means that in equity as in law the plaintiff's fault, like the defendant's, may be relevant to the question of what if any remedy the plaintiff is entitled to." (quotations and brackets omitted)). So the jury's consideration of whether

---

[5] *See also Dumont v. Dufore*, 27 Ind. 263, 267 (1866) ("If it was illegal, immoral, or against public policy, each, equally with the other, had offended. In such a case, it has been generally held that the law will not give its aid to either party, but will leave them in the condition in which it finds them."); *Overshiner v. Wisehart*, 59 Ind. 135, 138 (1877) ("The law leaves them just where they placed themselves. The court therefore erred in granting relief to Wisehart, notwithstanding the note could not be enforced against him; nor had the plaintiff any right to appear at the altar of Justice with unclean hands. The court should have dismissed the case, even though the defendant did not claim any relief from the fraud; not because he is more favored than the plaintiff, but because both are equally culpable."); *Lynch v. Rosenthal*, 42 N.E. 1103, 1106 (Ind. 1896) ("It is enough to say that one who asks equity must present clean hands in which to receive it. Here the appellant, from the beginning, had unclean hands. He originated, carried forward, and in this suit sought to enforce, a vicious contract. He is in no position to ask that equity estop his ally from exposing the vice of that contract, the enforcement of which public morals forbids.").

Nemeth can prove the elements of his unjust enrichment claim already involves the same consideration that the unclean hands doctrine covers.

Because common law courts recognized a corollary defense to the unclean hands doctrine, and because the jury must undertake the same consideration as the unclean hands doctrine when deciding the elements of Nemeth's claim, the Panzicas may invoke the doctrine in defense.

### 4. The jury must decide the Panzicas' unclean hands defense.

Yet while we agree with the Panzicas that they can invoke the doctrine, we disagree that this makes the denial of Nemeth's jury request harmless. The Panzicas argue that the court's denial of Nemeth's jury right was harmless because the judge ruled that the unclean hands doctrine barred the claim anyway. But as we discussed in the previous section, the jury, rather than the judge, was required to consider the doctrine in the first instance. And while the Panzicas are correct that the judge may enter a directed verdict or judgment notwithstanding the verdict, that is only when the evidence is undisputed or doesn't support the judgment, which is not the case here. *Cosme v. Clark*, 232 N.E.3d 1141, 1150 (Ind. 2024).

Nemeth therefore remains entitled to present his unjust enrichment claim to a jury, although the Panzicas may invoke the unclean hands doctrine for the jury's consideration. Because the trial court instead mistakenly entered judgment without a jury trial, we must vacate the judgment.

# Conclusion

For these reasons, we vacate the judgment and remand for a jury trial.

Rush, C.J., and Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANTS
Carol Nemeth Joven
Ronald J. Waicukauski
Williams Law Group, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
John D. LaDue
Stephen M. Judge
Tiernan B. Kane
SouthBank Legal
South Bend, Indiana

ATTORNEYS FOR *AMICUS CURIAE* INDIANA BUSINESS LAW
ATTORNEYS
Peter J. Rusthoven
John R. Maley
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR *AMICUS CURIAE* DEFENSE TRIAL COUNSEL OF
INDIANA
Hannah Kaufman Joseph
William J. Brinkerhoff
Jeselskis Brinkerhoff and Joseph, LLC
Indianapolis, Indiana

Lucy R. Dollens
Quarles & Brady, LLP
Indianapolis, Indiana

ATTORNEY FOR *AMICUS CURIAE* INDIANA TRIAL LAWYERS
ASSOCIATION
James P. Barth
Pfeifer, Morgan & Stesiak
South Bend, Indiana